**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

```
CSR TECHNOLOGY INCORPORATED,           ) AU:12-CV-00297-LY
                                       )
   Plaintiff,                          )
                                       )
VS.                                    ) AUSTIN, TEXAS
                                       )
BANDSPEED INCORPORATED, BANDSPEED      )
INCORPORATED, CSR TECHNOLOGY INCORPORATED, )
                                       )
   Defendants.                         ) AUGUST 17, 2012
```

          ************************************************
                  TRANSCRIPT OF MARKMAN HEARING

                BEFORE THE HONORABLE LEE YEAKEL
          ************************************************

APPEARANCES:

```
CSR TECHNOLOGY INCORPORATED: PATRICK E. KING
                             JEFFREY E. DANLEY
                             SIMPSON THACHER & BARTLETT LLP
                             2550 HANOVER STREET
                             PALO ALTO, CALIFORNIA 94304

BANDSPEED, INC.:             ANDREW G. DINOVO
                             JOHN D. SABA, JR.
                             DINOVO PRICE ELLWANGER & HARDY LLP
                             7000 N. MOPAC EXPY, SUITE 350
                             AUSTIN, TEXAS 78731

COURT REPORTER:              ARLINDA RODRIGUEZ, CSR
                             200 WEST 8TH STREET
                             AUSTIN, TEXAS 78701
                             (512) 916-5143
```

Proceedings recorded by computerized stenography, transcript
produced by computer.

13:34:17  1      (Open Court)

13:34:17  2          THE COURT:  This is Cause Number 12-CV-297 on my

13:34:21  3  docket.  Let me hear from you-all as to who's here and who you

13:34:28  4  represent.

13:34:29  5          MR. KING:  Your Honor, Patrick King from Simpson

13:34:32  6  Thacher representing CSR.

13:34:34  7          MR. DANLEY:  Your Honor, Jeff Danley, also from

13:34:37  8  Simpson Thacher, representing CSR Technology.

13:34:40  9          MR. KING:  And with us today is Dr. Robert Akl, who

13:34:43  10 is an expert, who is going to provide, with the Court's

13:34:46  11 Permission, a short technical tutorial at the beginning of the

13:34:49  12 presentation.

13:34:49  13         THE COURT:  All right.  Thank you.

13:34:51  14         MR. DINOVO:  Good afternoon, Your Honor.  Drew DiNovo

13:34:53  15 on behalf of Defendant Bandspeed.

13:34:55  16         MR. SABA:  Good afternoon.  John Saba, Your Honor, on

13:34:57  17 behalf of Bandspeed from DiNovo Price as well.

13:35:05  18         THE COURT:  Very good.  All right.  We had a phone

13:35:10  19 call indicating that y'all might want to do briefly on a

13:35:13  20 tutorial; is that correct, before we get started?

13:35:15  21         MR. DINOVO:  Your Honor, we were notified by the

13:35:18  22 plaintiff that they intended to do that.  And we asked the

13:35:20  23 Court, and the Court said that they were open to it.  So,

13:35:24  24 unfortunately, our expert was unavailable on that short

13:35:27  25 notice.  What we have is a short tutorial that you will have

13:35:30   1   the unfortunate requirement that I be presenting it, but it

13:35:34   2   will be with his endorsement.

13:35:37   3         THE COURT:  Well, let me -- let me say this.  We said

13:35:41   4   that I certainly didn't mind commencing this with a tutorial.

13:35:53   5   I don't know whether it is necessary that it be totally

13:35:56   6   separate from what you're otherwise doing or whether we just

13:36:00   7   kind of incorporate it into your presentations.  You can use

13:36:07   8   that as a beginning and then get into your argument, and then

13:36:11   9   you can present whatever you want to present and get into your

13:36:15  10   argument.  I think that might make things flow a little better

13:36:19  11   at this point than trying to give you X number of minutes for

13:36:22  12   tutorial and then breaking.  What is your feeling on that,

13:36:25  13   Mr. King?

13:36:26  14         MR. KING:  Your Honor, I respectfully think that it

13:36:30  15   may be to the advantage to have the tutorials done separately

13:36:33  16   at the front.  That's only because the court reporter, as I

13:36:37  17   understand it from conversations I've had with Mr. DiNovo, we

13:36:40  18   don't expect the testimony of the experts and what Mr. DiNovo

13:36:47  19   plans to read to be on the record.  So we could do that

13:36:50  20   initially up front off the record because it's not evidence and

13:36:53  21   then go into the argument.  But I'm happy to do it in whatever

13:36:58  22   way the Court prefers.

13:37:00  23         THE COURT:  No.  That just confirms everything else

13:37:03  24   about these cases.  Everybody has a way they want to do it that

13:37:07  25   is different from the way the Court wants to do it.

13:37:14  1          Ms. Rodriguez, you need to hang around, but you don't

13:37:14  2   need to put this on the record.

13:37:14  3      (Tutorial)

14:05:21  4          THE COURT:  Mr. King, you may proceed.

14:05:24  5          MR. KING:  Your Honor, if I may I approach the

14:05:26  6   Bench.  I have two copies of our slides, one for you and one

14:05:31  7   for your clerk.

14:05:32  8          THE COURT:  All right.  Thank you.

14:05:40  9          MR. KING:  Thank you, Your Honor, for giving us an

14:05:41  10  opportunity to present our proposed constructions.  Again, I'm

14:05:45  11  Patrick King, representing CSR technology.  I want to go --

14:05:51  12  give you a little idea of the structure of presentation today

14:05:55  13  that I'll be offering.

14:05:56  14          I'd like to start with a little bit of background on

14:05:58  15  the patent just so you have a sense of what the patent is and

14:06:02  16  where it came from.  I'll describe the claim construction

14:06:06  17  methodology we use to approach our constructions.  I know that

14:06:10  18  you're well aware of the intricacies of the claims

14:06:13  19  construction, so I'm not going to spend a lot of time on that.

14:06:16  20  And then we'll go through each of the claims and describe why

14:06:19  21  we take the positions we do and why I believe Bandspeed's

14:06:22  22  positions are not the preferred positions.

14:06:26  23          The patent is the 6,792,247.  It's a -- the patent

14:06:32  24  was issued on September 14th, 2004.  It's -- the inventors are

14:06:38  25  Hock Law and Dennis Kwan, and it was originally assigned to a

| | | |
|---|---|---|
| 14:06:43 | 1 | company named Microtune, Incorporated in San Diego.  The |
| 14:06:46 | 2 | original application of this patent was filed May 8th, of 2011 |
| 14:06:51 | 3 | and claims priority to two provisional applications. |
| 14:06:54 | 4 | In Bandspeed's briefing they suggested that we bought |
| 14:06:58 | 5 | this patent to bring suit against them.  I just want to make |
| 14:07:02 | 6 | clear that the patent was originally assigned to Microtune in |
| 14:07:05 | 7 | September of 2004.  Microtune was then acquired in a strategic |
| 14:07:10 | 8 | acquisition by Zoran Corporation in September 2010, and CSR |
| 14:07:15 | 9 | acquired Zoran in a strategic acquisition in February of 2011. |
| 14:07:20 | 10 | We have gone over both Dr. Akl and Mr. DiNovo |
| 14:07:24 | 11 | described the basic construct of the patent, and the abstract |
| 14:07:27 | 12 | describes it.  The method is described and comprising receiving |
| 14:07:33 | 13 | a synchronization packet transmitted from a first device; |
| 14:07:37 | 14 | receiving a data packet transmitted from the first device, the |
| 14:07:40 | 15 | data packet being offset from the synchronization packet by a |
| 14:07:46 | 16 | particular amount of time; and identifying the first device |
| 14:07:49 | 17 | base on the amount of time from which the data packet is offset |
| 14:07:53 | 18 | from the synchronization packet. |
| 14:07:56 | 19 | That language is very closely related to claim one, |
| 14:07:58 | 20 | and we'll go through each of those later. |
| 14:07:58 | 21 | We are asserting eight of 27 claims -- two |
| 14:08:01 | 22 | independent claims and six dependent claims.  And these are |
| 14:08:05 | 23 | terms for construction.  It's seven terms in all.  The first |
| 14:08:08 | 24 | three are closely related:  "Packet," "synchronization packet," |
| 14:08:13 | 25 | and "[first] data packet."  They appear in claims 1, 2, and |

| | | |
|---|---|---|
| 14:08:17 | 1 | 20.  I guess the "[first] data packet" only goes to 1 and 20. |
| 14:08:20 | 2 | There are some additional dependent claims that |
| 14:08:24 | 3 | incorporate these terms by reference, but they only appear in |
| 14:08:26 | 4 | the claims noted.  "Periodically" appears only in claim two. |
| 14:08:30 | 5 | "Offset" and "timing offset" we have proposed construction -- |
| 14:08:32 | 6 | the same construction for both terms because we believe each |
| 14:08:36 | 7 | term means the same thing, and they appear in claim one and |
| 14:08:38 | 8 | claim two.  And, finally, "host processor environment" in claim |
| 14:08:42 | 9 | 25. |
| 14:08:43 | 10 | So let me tell you a little bit about how we |
| 14:08:46 | 11 | approached claim construction.  The courts have made it clear |
| 14:08:50 | 12 | that claim construction should focus on intrinsic evidence, and |
| 14:08:53 | 13 | we tried our best to do that, focusing first on the claims and |
| 14:08:56 | 14 | then look at the claims and the specifications as they shed |
| 14:09:00 | 15 | light on how the claim is being interpreted and, finally, |
| 14:09:04 | 16 | prosecution history. |
| 14:09:05 | 17 | As the courts have noted throughout the recent |
| 14:09:09 | 18 | history of claim construction, extrinsic evidence is helpful |
| 14:09:13 | 19 | but secondary to intrinsic evidence.  I know the Court is well |
| 14:09:16 | 20 | aware of that.  And, as I said, our constructions, we tried |
| 14:09:20 | 21 | very hard to focus on the claims and specification. |
| 14:09:23 | 22 | Bandspeed in contrast has -- their constructions rely |
| 14:09:29 | 23 | heavily on extrinsic evidence, primarily on dictionary |
| 14:09:32 | 24 | definitions and Bluetooth specification and, finally, on the |
| 14:09:36 | 25 | prosecution history of a later patent application. |

14:09:39  1          First on the dictionary definitions, the extrinsic

14:09:47  2     evidence of this nature should be given less weight.  I think

14:09:49  3     there are certainly instances where the Court may wish to look

14:09:52  4     at dictionary definitions, but they shouldn't be used to take

14:09:56  5     the claims in a different direction than are described in the

14:10:00  6     specification.

14:10:01  7          Mr. DiNovo in his technical presentation, and I'm

14:10:04  8     sure you'll hear more in his presentation to the Court, spent

14:10:08  9     quite a bit of time talking about the Bluetooth specification

14:10:11  10    and saying the Bluetooth specification -- the Bluetooth

14:10:15  11    embodiment was the primary embodiment of the patent.  I just

14:10:19  12    want to make sure this is clear right up front:  The patent

14:10:23  13    does describe Bluetooth implementation as a preferred

14:10:26  14    embodiment.  It's not limited to Bluetooth.  There's little

14:10:29  15    dispute of that.

14:10:30  16         If you look at the cited paragraph from column 6,

14:10:34  17    line 38 through 43, it says:  While the embodiments described

14:10:38  18    focus on Bluetooth protocol, many of the underlying principles

14:10:42  19    of the invention may be -- may practiced using various other

14:10:45  20    types of wireless and terrestrial protocols.  Accordingly, the

14:10:52  21    scope and spirit of the invention should be judged in terms of

14:10:55  22    claims which follow.

14:10:55  23         So now let's look at the claims which follow.  And

14:10:57  24    this makes it crystal clear that this is not a Bluetooth-only

14:11:01  25    method.

14:11:02  1            Claim 21 is, The wireless apparatus as in claim 20
14:11:09  2  further comprising:  Bluetooth protocol logic configured to
14:11:13  3  communicate with wireless devices according to the Bluetooth
14:11:17  4  protocol.
14:11:17  5            This is a dependent claim that claims Bluetooth
14:11:20  6  implementation.  And under the holding -- the Federal Circuit
14:11:25  7  holding in *Phillips* and many other cases that have followed
14:11:28  8  that:  The presence of dependent claim that adds a particular
14:11:32  9  limitation gives rise to a presumption that the limitation in
14:11:35  10  question is not present in the independent claim.
14:11:39  11            We think this is clear evidence that the scope of the
14:11:42  12  patent is beyond Bluetooth and relies on Bluetooth spec is not
14:11:49  13  even really extrinsic evidence.  It's almost irrelevant
14:11:52  14  evidence.
14:11:54  15            Finally, Bandspeed, relies heavily in their claim
14:12:10  16  construction analysis on the prosecution of the '272
14:12:16  17  application.  They describe it as the part of the prosecution
14:12:21  18  history of the patent in dispute.  At one point in their
14:12:24  19  briefing they describe it as the parent application.  That's
14:12:28  20  false, and it's not intrinsic evidence and it's not part of the
14:12:31  21  prosecution history both as a matter of law and fact.
14:12:35  22            The prosecution history of '272 application is
14:12:40  23  extrinsic evidence.  As noted in the Federal Circuit holding of
14:12:47  24  *Goldenberg v. Cytogen*:  The related application is only
14:12:49  25  intrinsic evidence as it existed at the time the applicant

14:12:53   1   distinguished one application from the other.

14:12:55   2            And just so it's clear, the '727 application is a

14:12:58   3   separate application that claims priority to the same

14:13:02   4   provisional applications that the patent at issue in this

14:13:05   5   dispute claim priority to.  But it was a separate application.

14:13:10   6            I've cited another case, and it's one of others that

14:13:12   7   have looked to *Goldenberg* as evidence that applications even

14:13:18   8   from the same family that are not -- that postdate the issuance

14:13:22   9   of a patent are not extrinsic evidence -- not intrinsic

14:13:26  10   evidence, but are extrinsic evidence.

14:13:28  11            And this is the history of the two patents here, I

14:13:31  12   think pretty clear why this is extrinsic evidence.  The patent

14:13:35  13   that's at issue in this case is noted in blue.  It was

14:13:39  14   originally filed, and the main portion of the prosecution

14:13:42  15   history, it was between March of 2002 and May of 2004.

14:13:47  16            At the end of that prosecution history, the examiner

14:13:52  17   that was looking at the application that eventually issued is

14:13:55  18   the '247 said that the '733, which was that application,

14:13:59  19   presents a patentably distinct invention from the '727.  That's

14:14:05  20   the application that Bandspeed relies on.  It's a patentably

14:14:09  21   distinct invention.

14:14:10  22            That was all done during the prosecution history of

14:14:16  23   the patent at issue in this case.  The patent issued in

14:14:18  24   September of 2004, and then the application process began for

14:14:22  25   the second patent.

14:14:22   1         All of the extrinsic evidence that Bandspeed cites to

14:14:27   2   is from the period in 2005 and 2006 -- I think predominantly in

14:14:32   3   2006 in this separate application which eventually issued as

14:14:38   4   the '451 patent in June of 2007.

14:14:43   5         Okay.  So I cite a case up here which is very

14:14:46   6   important.  The case under binding precedent, a patentee is not

14:14:50   7   bound or estopped by a statement made in connection with a

14:14:53   8   later application on which the examiner of the first

14:14:56   9   application could not have relied.

14:14:58  10         As you can see from the time line here, any

14:15:01  11   statements made in the prosecution of the '727 application

14:15:04  12   occurred after the '247 patent issued.  And, obviously, the

14:15:08  13   patent examiner of the '247 patent could not have relied on the

14:15:12  14   statements.  So it's binding precedent.  Those statements

14:15:15  15   cannot be used as a prosecution history estoppel with an

14:15:21  16   exception.  And I'd like to call that exception explicitly.

14:15:25  17         There's an exception to the rule that only when a

14:15:27  18   patentee, in prosecuting a related application -- a later

14:15:31  19   application, makes statements as to the scope of the invention

14:15:34  20   claimed in the earlier application.  Explicit statements about

14:15:37  21   the scope of the invention and the earlier application.  That

14:15:40  22   would be an exception where the Court would want to consider

14:15:42  23   those statements.

14:15:44  24         It tracks closely the general analysis of prosecution

14:15:49  25   history estoppel, which is a patentee can limit claim scope

| 14:15:54 | 1 | while prosecuting a patent only by using words or expressions |
|----------|----|---|
| 14:15:57 | 2 | of manifest exclusion or restriction representing a clear |
| 14:16:01 | 3 | disavowal of claim scope.  And I know the Court is well aware |
| 14:16:04 | 4 | of this precedent.  This is not anything new to the Court, but |
| 14:16:07 | 5 | it's very important here.  You'll see as we talk about the |
| 14:16:10 | 6 | statements in the prosecution history of this later application |
| 14:16:13 | 7 | that Bandspeed is relying on, they come nowhere near a clear |
| 14:16:17 | 8 | disavowal of claim scope.  They're largely irrelevant. |
| 14:16:22 | 9 | All right.  So let's get into the terms themselves. |
| 14:16:25 | 10 | The first term is "packet."  We heard quite a bit about what a |
| 14:16:28 | 11 | packet is and what it's not.  We think that the clearest |
| 14:16:31 | 12 | construction for packet is a signal.  And Bandspeed's proposed |
| 14:16:36 | 13 | construction -- and we're on slide 21 now -- is a group of |
| 14:16:41 | 14 | binary digits which is switched, if at all, and transmitted as |
| 14:16:44 | 15 | a composite whole.  The term "packet" appears in claims 1, 2, |
| 14:16:49 | 16 | and 20.  It's also asserted through corporation in claims 8, 9, |
| 14:16:53 | 17 | and 10, and 25 and 26. |
| 14:16:55 | 18 | So we believe the claims clearly support CSR's |
| 14:16:59 | 19 | construction.  Claim one, for instance, talks about receiving a |
| 14:17:04 | 20 | synchronization packet transmitted from a first device; |
| 14:17:08 | 21 | receiving a first data packet transmitted from a first device. |
| 14:17:11 | 22 | The packets are received and transmitted by devices and are |
| 14:17:14 | 23 | transported as carrier signals. |
| 14:17:16 | 24 | And if you'll look at the diagram -- this was from |
| 14:17:19 | 25 | Dr. Akl's presentation -- he described how digital signals, |

14:17:24  1  which can represent binary digits, are modulate and prepared

14:17:30  2  for transmission that could be transmissions wirelessly or over

14:17:34  3  a wired line, but the transmissions are done as analog signals,

14:17:39  4  as frequencies.  And let me be clear here, and I think Dr. Akl

14:17:44  5  alluded to this, but the idea that you have a packet of

14:17:47  6  information, and that information may be zeros and ones in the

14:17:51  7  portion of this -- of the illustration to the far left.

14:17:53  8         Those might be zeros and ones as it's being passed

14:17:57  9  through the protocol stack of whatever protocol might be

14:18:01 10  implemented in the device.  But before it can be transmitted,

14:18:04 11  the information needs to be expressed as a frequency.  And this

14:18:08 12  is clear in the claims because you're transmitting it

14:18:13 13  wirelessly as a signal -- a carrier signal between two

14:18:18 14  devices.  So those -- the two devices may send packets of

14:18:22 15  information as bursts of signals -- signal bursts that go from

14:18:26 16  one to the next and they carry the information that's included

14:18:29 17  in the packets.

14:18:30 18         THE COURT:  So you assert that a packet is a signal?

14:18:37 19         MR. KING:  Yes, sir.

14:18:38 20         THE COURT:  And Bandspeed asserts that it's a group

14:18:42 21  of binary digits, et cetera.  So is your argument that a

14:18:46 22  patent -- I mean, that a packet may contain more than binary

14:18:54 23  digits?  Is that what I'm hearing you say?

14:18:56 24         MR. KING:  Not quite.  The way I understand it is-

14:18:59 25         THE COURT:  Well, what's the difference between a

| | | |
|---|---|---|
| 14:19:01 | 1 | signal, as you assert, and a group of binary digits, as |
| 14:19:09 | 2 | Bandspeed asserts? |
| 14:19:10 | 3 | MR. KING:  The binary digits are represented in |
| 14:19:14 | 4 | different ways in different parts of the process.  The binary |
| 14:19:19 | 5 | digits are represented as, you know, X's and O's as it's |
| 14:19:23 | 6 | running through -- as Mr. DiNovo described in his tutorial, how |
| 14:19:28 | 7 | they can be -- groups of them can be explained as X's and O's |
| 14:19:33 | 8 | as it goes through the protocol stack.  That information, those |
| 14:19:36 | 9 | X's and O's, needs to be converted into a different expression |
| 14:19:41 | 10 | for a transmission between two wireless devices.  It's |
| 14:19:44 | 11 | transmitted as a frequency, as a frequency transmission. |
| 14:19:50 | 12 | So to the extent the information that's inherit in |
| 14:19:54 | 13 | those X's and O's as it passes through the digital signal -- |
| 14:19:59 | 14 | that's a signal as well.  As Mr. DiNovo referred to repeatedly, |
| 14:20:04 | 15 | that's a signal as well.  But when it's converted into a signal |
| 14:20:07 | 16 | to be transmitted, it's expressed as an analog wave -- as a |
| 14:20:11 | 17 | wave form, as a frequency in transmission. |
| 14:20:14 | 18 | THE COURT:  What I'm getting to is:  What is the |
| 14:20:16 | 19 | difference between your definition and Mr. DiNovo's definition |
| 14:20:24 | 20 | other than the words?  What are you arguing happens -- why is |
| 14:20:32 | 21 | the trier of fact more enlightened by considering a signal than |
| 14:20:37 | 22 | the trier of fact is enlightened by a group of binary digits |
| 14:20:43 | 23 | which is switched, if at all, and transmitted as a composite |
| 14:20:46 | 24 | whole?  You're going to have to explain that.  Whatever claims |
| 14:20:51 | 25 | construction I assert, both of you are going to be stuck with |

| | | |
|---|---|---|
| 14:20:55 | 1 | that and are going to have to explain it to the jury. |
| 14:20:58 | 2 | So what is the difference?  In your mind, what |
| 14:21:01 | 3 | difference does it make if I construe the term your way or |
| 14:21:05 | 4 | Bandspeed's way? |
| 14:21:06 | 5 | MR. KING:  I'll do my best to answer that question. |
| 14:21:08 | 6 | It's an excellent question and it gets to the heart of it. |
| 14:21:13 | 7 | In -- our construction focuses on the portion of this operation |
| 14:21:19 | 8 | that's relevant to the patent.  And what's relevant to the |
| 14:21:23 | 9 | patent, what this method is describing and claiming and |
| 14:21:26 | 10 | focusing on is that process of a device communicating with |
| 14:21:31 | 11 | another device, of looking at the packets that are being sent, |
| 14:21:35 | 12 | the bursts of data, the information, the signal that's |
| 14:21:38 | 13 | coming -- |
| 14:21:38 | 14 | THE COURT:  Between two towers? |
| 14:21:40 | 15 | MR. KING:  Between the two towers.  The most relevant |
| 14:21:44 | 16 | one is the receiving tower because it's looking at the time |
| 14:21:47 | 17 | that these things are received and measuring the time between |
| 14:21:49 | 18 | them. |
| 14:21:50 | 19 | THE COURT:  Right. |
| 14:21:50 | 20 | MR. KING:  So what's relevant for this patent is |
| 14:21:53 | 21 | there are signals being sent.  And that's where we want -- |
| 14:21:56 | 22 | that's what the patent focuses on, and that's where we want the |
| 14:22:00 | 23 | Court and the jury to focus on, is that it's -- |
| 14:22:03 | 24 | THE COURT:  Well, tell me what a signal is. |
| 14:22:06 | 25 | MR. KING:  A signal is a -- is a transmission of |

| | | |
|---|---|---|
| 14:22:12 | 1 | information of a wave form between two devices. |
| 14:22:17 | 2 | THE COURT:  All right.  And it is not a group of |
| 14:22:19 | 3 | binary digits that runs between the two devices.  It is binary |
| 14:22:24 | 4 | digits that have been converted to something else, and then |
| 14:22:27 | 5 | they get reconverted back to binary digits at the modulator? |
| 14:22:32 | 6 | MR. KING:  That's right. |
| 14:22:33 | 7 | THE COURT:  Is that your argument? |
| 14:22:34 | 8 | MR. KING:  That's right.  And the reason I think |
| 14:22:36 | 9 | that's important is because what I think Mr. DiNovo and |
| 14:22:39 | 10 | Bandspeed is focusing on is the portion of the communication |
| 14:22:43 | 11 | path that is before the modulator. |
| 14:22:46 | 12 | THE COURT:  I don't care what they're focusing on. |
| 14:22:48 | 13 | MR. KING:  Okay. |
| 14:22:49 | 14 | THE COURT:  It doesn't help -- I'll tell both of you |
| 14:22:53 | 15 | this.  It doesn't help very much with me to discredit what the |
| 14:22:56 | 16 | other side wants.  I want to know what you want and why you get |
| 14:22:59 | 17 | it.  And I'll work that out based on what you say, and I'll |
| 14:23:02 | 18 | work Bandspeed out based on what it says.  But you waste a lot |
| 14:23:06 | 19 | of your precious time by telling me why the other side is |
| 14:23:09 | 20 | wrong.  I want to know why you're right. |
| 14:23:11 | 21 | MR. KING:  Okay. |
| 14:23:11 | 22 | THE COURT:  So what I want to know is, does a signal |
| 14:23:17 | 23 | more clearly describe what is happening in the patent than a |
| 14:23:21 | 24 | group of binary digits more clearly describes what's happening |
| 14:23:26 | 25 | in the process in the patent -- |

14:23:27   1          MR. KING:  Absolutely.

14:23:28   2          THE COURT:  -- and why.  That's what wins for you and

14:23:33   3   might win for Mr. DiNovo when turned around the other way.  So

14:23:36   4   what you need to tell me is why a signal is more descriptive of

14:23:41   5   what is happening -- more accurately descriptive of what is

14:23:45   6   happening than the phrase "a group of binary digits,"

14:23:50   7   et cetera.

14:23:51   8          MR. KING:  I absolutely think the signal more clearly

14:23:54   9   captures what "packet" means in the context of this patent.  As

14:23:59  10   I said, the patent is focusing on the transmission and the

14:24:02  11   reception of blocks of information that are sent as signals.

14:24:09  12   And for purposes of the patent, the packet is a block of

14:24:19  13   information that is a signal.  And we think that that simply

14:24:25  14   and directly gets to the heart of what this patent is claiming.

14:24:28  15          THE COURT:  Now, is all that is in there are

14:24:33  16   converted binary digits, or are there other things in there in

14:24:38  17   the analog line that goes between the two towers?

14:24:44  18          MR. KING:  The patent doesn't say, and I don't think

14:24:46  19   it's relevant necessarily to the patent.

14:24:49  20          THE COURT:  No.  But I asked you a question.  I

14:24:51  21   didn't ask you what's relevant to the patent.  I asked you a

14:24:54  22   direct question.  What is in there going between the two

14:24:57  23   towers, just binary digits that have been converted or

14:25:01  24   something more than that?

14:25:03  25          MR. KING:  And the answer is it depends what the two

14:25:07   1  devices are communicating and what protocol they're using.  In

14:25:09   2  a protocol, for instance, Wi-Fi, then it would be an expression

14:25:14   3  of X's and O's in an analog signal.  So it would be a binary

14:25:22   4  information that's being transmitted in that packet.  In other

14:25:25   5  types of protocols, it's not necessarily so.  It could just be

14:25:32   6  a signal without the binary aspect.  The information could be

14:25:35   7  transmitted in different ways.

14:25:37   8       And the patent doesn't make any distinction, doesn't

14:25:41   9  make any limitation on the signal being an X and an O or a one

14:25:45  10  and a zero.  It only talks about the packet being received and

14:25:49  11  the timing between receipt of packets.

14:25:51  12       THE COURT:  All right.

14:25:52  13       MR. KING:  I hope that answers your question.

14:25:54  14       THE COURT:  Yeah.  You can go.  Go ahead.

14:25:57  15       MR. KING:  So, again, I won't spend too much time on

14:26:03  16  this.  But the claim talks about synchronization packets

14:26:08  17  transmitted and looking at a synchronization packet and a first

14:26:13  18  data packet and looking at the time between them and through

14:26:14  19  that identifying device.

14:26:16  20       That's also described in the abstract, and we've gone

14:26:19  21  over this sort of quickly.  What the patent is not saying, it

14:26:23  22  says nothing about the physical characteristics of the packet.

14:26:25  23  And this gets to your question, I believe, Your Honor.  It

14:26:28  24  doesn't say anything about binary digits.  It doesn't say

14:26:32  25  anything about what the packet looks like or how it's

| | | |
|---|---|---|
| 14:26:36 | 1 | structured. |
| 14:26:36 | 2 | THE COURT:  And are we going to presume that each one |
| 14:26:48 | 3 | of the jurors knows what a signal is? |
| 14:26:50 | 4 | MR. KING:  I think I'm comfortable with that. |
| 14:26:52 | 5 | THE COURT:  If I accept your construction and |
| 14:26:58 | 6 | construe it as a signal, are you comfortable that the jury will |
| 14:27:02 | 7 | understand what a signal is? |
| 14:27:03 | 8 | MR. KING:  Yes, Your Honor. |
| 14:27:04 | 9 | THE COURT:  What do we think they're going to think |
| 14:27:08 | 10 | it is? |
| 14:27:08 | 11 | MR. KING:  What do I think that the jury will think |
| 14:27:10 | 12 | they are? |
| 14:27:10 | 13 | THE COURT:  Yeah. |
| 14:27:11 | 14 | MR. KING:  I think they'll understand that a signal |
| 14:27:13 | 15 | is a transmission of a frequency, of an analog wave and there |
| 14:27:18 | 16 | are different ways to describe it.  Basically an analog wave. |
| 14:27:21 | 17 | THE COURT:  An electronic wave that moves between the |
| 14:27:24 | 18 | two towers? |
| 14:27:26 | 19 | MR. KING:  Yes, Your Honor. |
| 14:27:27 | 20 | THE COURT:  All right. |
| 14:27:27 | 21 | MR. KING:  And it doesn't say anything about the |
| 14:27:29 | 22 | content of the packet.  Now, I know you said you don't want me |
| 14:27:33 | 23 | to attack their constructions. |
| 14:27:35 | 24 | THE COURT:  You can do it if you want to.  I'm just |
| 14:27:37 | 25 | telling you you generally waste your time doing it.  I don't |

14:27:40  1   care what you do.

14:27:41  2             MR. KING:  Okay.  So I will do it very quickly and

14:27:43  3   waste a little bit of time, but not too much.

14:27:45  4             THE COURT:  That was just some advice.

14:27:46  5             MR. KING:  It's good advice.  I wish I'd had the

14:27:47  6   advice before I presented my slides.  But I think I'll just do

14:27:50  7   this quickly.  The patent says nothing about binary digits.  It

14:27:55  8   says nothing about it being switched.  In fact, it talks about

14:27:58  9   communications between devices where there is no switching

14:28:00  10  going on.  It doesn't say anything about transmitting it as a

14:28:03  11  group or a composite whole.

14:28:05  12            That doesn't -- these constructs don't appear in the

14:28:08  13  patent.  So where did they come from?  They come from a

14:28:17  14  dictionary definition.  And Bandspeed cites to a dictionary

14:28:20  15  from 2000, and the first definition is, "a group of binary

14:28:24  16  digits including data control elements which is switched and

14:28:29  17  transmitted as a composite whole."

14:28:31  18            So that's where the definition came from.  The

14:28:32  19  definition goes on to say, "The data and control elements and

14:28:34  20  possibly error control information are arranged in a specified

14:28:36  21  format."  They don't include that part of the definition, but

14:28:39  22  that was part of the definition that they cited to.

14:28:42  23            Now, this I think really illustrates effectively the

14:28:48  24  danger of using dictionary definitions.  There are 12 different

14:28:52  25  definitions for "packet" in this same reference.  And if you

14:28:56  1   look, one describes it as a block of information that's

14:28:59  2   transmitted.  One's a collection of symbols, a 17-bit unit of

14:29:04  3   data, a sequence of N_chars, unit of data, a serial stream.

14:29:08  4          All of these things are packets and fairly describe

14:29:11  5   what a packet is in different contexts, but not in the context

14:29:15  6   of transmitting between one wireless device to another.  The

14:29:22  7   closest one of these I think, in my humble opinion, that gets

14:29:26  8   to the idea of transmission is number nine, which talks about

14:29:29  9   "a block of information that is transmitted within a single

14:29:31  10  transfer operation."

14:29:32  11         That I think describes what we have in mind as a

14:29:35  12  signal, because the signal is a block of information that's

14:29:38  13  being transmitted between two devices.

14:29:42  14         I'll talk briefly about the prosecution history that

14:29:44  15  they rely on.

14:29:46  16         Now, what they've done here -- this is interesting.

14:29:51  17  I think the citation of the prosecution history that Bandspeed

14:29:55  18  relies on actually proves our point.  They point to the portion

14:29:59  19  of the claim from this separate application that I underlined

14:30:05  20  in red.  And it basically says, receiving a signal;

14:30:09  21  generating a data packet corresponding to the signal.

14:30:12  22         And the examiner in this later application said,

14:30:15  23  well, in looking at the specification, I don't see any

14:30:19  24  description of receiving a signal and generating a packet from

14:30:22  25  the signal.  So the patent -- the patentees just took it out.

| | | |
|---|---|---|
| 14:30:27 | 1 | They just crossed it out and left it -- they realized it wasn't |
| 14:30:32 | 2 | necessary to their claim, so they just took it out. |
| 14:30:35 | 3 | Well, what was necessary to their claim?  They talk |
| 14:30:37 | 4 | about a synchronization packet transmitted wirelessly at a |
| 14:30:41 | 5 | radio frequency.  They talk about transmitting the first data |
| 14:30:45 | 6 | packet at a radio frequency.  What they're talking about in |
| 14:30:49 | 7 | that patent is sending information, sending packets as signals |
| 14:30:53 | 8 | between two wireless devices. |
| 14:30:55 | 9 | Now, in that context, of course they drop the |
| 14:30:58 | 10 | language that the examiner pointed to because it makes no sense |
| 14:31:01 | 11 | to receive a signal and generate a data packet corresponding to |
| 14:31:06 | 12 | the signal when the data packet is a signal.  So they drop it, |
| 14:31:09 | 13 | and it certainly does not represent a clear disavowal of claim |
| 14:31:13 | 14 | scope.  If anything, I think this clearly illustrates that the |
| 14:31:16 | 15 | patentees understood that, at least in this later application, |
| 14:31:20 | 16 | that a packet -- the synchronization packet, the first data |
| 14:31:26 | 17 | packet, was a frequency.  It was a radio frequency.  It was a |
| 14:31:30 | 18 | signal. |
| 14:31:31 | 19 | The next term we'd like to go to, with the Court's |
| 14:31:34 | 20 | permission, is "synchronization packet."  It appears in claim |
| 14:31:38 | 21 | 1, 2, and 20 and, through incorporation, in asserted claims 8, |
| 14:31:44 | 22 | 9, 10, 25, and 26. |
| 14:31:46 | 23 | Our construction is, a signal used to mark the start |
| 14:31:50 | 24 | of a, or the, time period.  It's either "a" and "the," |
| 14:31:56 | 25 | depending on where in the claims it's incorporated. |

| | | |
|---|---|---|
| 14:31:59 | 1 | Bandspeed's proposal is a discreet packet |
| 14:32:03 | 2 | specifically designated to contain only synchronization data. |
| 14:32:08 | 3 | We believe that our construction is well supported by |
| 14:32:10 | 4 | the claim.  If you look at claim one, it talks about receiving |
| 14:32:13 | 5 | a synchronization packet.  I'll do this quickly, because I know |
| 14:32:16 | 6 | that we've gone over this both with the experts and I've |
| 14:32:17 | 7 | touched on this before.  But first you receive a |
| 14:32:22 | 8 | synchronization packet.  And what does a synchronization packet |
| 14:32:25 | 9 | do?  It synchronizes your watches, let's start the time period, |
| 14:32:30 | 10 | because we're going to look for the data packets to come next. |
| 14:32:31 | 11 | And then we're going to measure an offset based on those |
| 14:32:33 | 12 | findings. |
| 14:32:33 | 13 | THE COURT:  What is in the synchronization packet? |
| 14:32:42 | 14 | Is it just a bit of energy which does no more than trigger a |
| 14:32:47 | 15 | clock, or does it tell the receiver something more and give the |
| 14:32:53 | 16 | receiver more information than just wake up and listen for |
| 14:32:57 | 17 | what's going to come next? |
| 14:32:59 | 18 | MR. KING:  It starts the clock and nothing more. |
| 14:33:02 | 19 | That's the difference between a synchronization packet and a |
| 14:33:06 | 20 | data packet. |
| 14:33:07 | 21 | THE COURT:  So then there is no synchronization data |
| 14:33:10 | 22 | in the synchronization packet? |
| 14:33:12 | 23 | MR. KING:  Not necessarily.  There's no need for it. |
| 14:33:16 | 24 | And if I can explain for a minute, I think I can explain why |
| 14:33:19 | 25 | that is in the context of the patent. |

14:33:21  1          If you look at -- unfortunately, I don't have a slide

14:33:25  2   for this because I didn't know you were going to ask this

14:33:25  3   question.

14:33:26  4          THE COURT:  Of course you don't.  That's why this job

14:33:28  5   is fun.

14:33:30  6          MR. KING:  Exactly.  So if you look at figure 4 and

14:33:32  7   you compare it to column 4 on lines 28 through 29, it talks

14:33:37  8   about the proprietary protocol that's used to perform the

14:33:45  9   operation of the method.  And that proprietary protocol is not

14:33:53  10  Bluetooth.  It's not Wi-Fi.  It's not any number of other

14:33:56  11  protocols.  It's a proprietary protocol that you're using to

14:33:59  12  identify -- to work this operation.

14:34:01  13         Now, in different systems, in different protocols,

14:34:06  14  synchronization information data, synchronization data that you

14:34:10  15  might think of as synchronization data takes many different

14:34:15  16  forms.  In Bluetooth it might be a particular bit of

14:34:19  17  information that's sent in -- at a different time than other

14:34:22  18  information.  In cellular technologies, it's basically

14:34:27  19  information sent on a different frequency.

14:34:30  20         THE COURT:  But what does it do?  Dr. Akl said that

14:34:39  21  what we have and what we're looking at in this process is the

14:34:42  22  amount of the offset to let the receiver know whether it's

14:34:49  23  coming from a cell phone or coming from a radar unit or coming

14:34:53  24  from a baby monitor or any of the -- or a Bluetooth device.

14:34:57  25         So if that is true, and if the key element that let's

| | | |
|---|---|---|
| 14:35:07 | 1 | the receiver know what it's getting is going to be the offset, |
| 14:35:12 | 2 | then why is there ever any other synchronization data than just |
| 14:35:17 | 3 | the ping to wake up the receiver and then the clock starts and |
| 14:35:20 | 4 | it counts the offset, and then when it starts receiving more |
| 14:35:25 | 5 | data, it knows where it's coming from? |
| 14:35:28 | 6 | MR. KING:  I think -- |
| 14:35:29 | 7 | THE COURT:  What more goes on between the time the |
| 14:35:32 | 8 | clock is started and the data packet arrives? |
| 14:35:35 | 9 | MR. KING:  That's what goes on.  That's what the |
| 14:35:38 | 10 | patent describes.  That's -- that is the essence of the |
| 14:35:42 | 11 | invention as described in the abstract, the claims, the |
| 14:35:45 | 12 | specification.  It's not protocol specific.  And the nature of |
| 14:35:53 | 13 | synchronization data is very different in different protocols, |
| 14:35:57 | 14 | and this patent doesn't touch any of that. |
| 14:35:59 | 15 | THE COURT:  Yeah.  But you haven't explained to me |
| 14:36:00 | 16 | what the synchronization data is.  That's what I keep trying to |
| 14:36:01 | 17 | get to. |
| 14:36:01 | 18 | MR. KING:  And I'm saying there isn't any. |
| 14:36:03 | 19 | THE COURT:  Okay.  Then how can it be -- if there's |
| 14:36:06 | 20 | not any, how can it be very different in various protocols? |
| 14:36:09 | 21 | Because It sounds to me like what you're telling me -- and I'm |
| 14:36:12 | 22 | a layman and everybody on the jury is going to be a layman |
| 14:36:15 | 23 | unless we work out a way to only send notices to electrical |
| 14:36:18 | 24 | engineers that live in Austin.  We've got enough of them.  We |
| 14:36:22 | 25 | could get a jury of electrical engineers in Austin.  But you're |

| | | |
|---|---|---|
| 14:36:26 | 1 | likely to get laypeople. |
| 14:36:28 | 2 | MR. KING:  Yes, sir. |
| 14:36:28 | 3 | THE COURT:  So what they're going to think -- and the |
| 14:36:31 | 4 | reason I ask these questions is to get you off of your |
| 14:36:33 | 5 | technical knowledge and into how you're going to try this case. |
| 14:36:37 | 6 | MR. KING:  I understand. |
| 14:36:38 | 7 | THE COURT:  That what a juror is likely to think is, |
| 14:36:41 | 8 | and the way they think is it's like an electrical spark or a |
| 14:36:45 | 9 | little bleep or something.  It's a noise or an electrical |
| 14:36:54 | 10 | charge or something that clicks that clock on, and then the |
| 14:36:56 | 11 | clock counts.  And then when it gets to the next indication, |
| 14:37:02 | 12 | then it knows what it's getting it from. |
| 14:37:05 | 13 | So it's going to be difficult for them to understand |
| 14:37:07 | 14 | when you say there are all kind of synchronization data if it |
| 14:37:11 | 15 | doesn't really matter what the synchronization data is and all |
| 14:37:16 | 16 | you're looking for here is something that starts the clock. |
| 14:37:19 | 17 | MR. KING:  I understand.  And let me try and -- |
| 14:37:19 | 18 | THE COURT:  It will go easier at trial if you thought |
| 14:37:21 | 19 | through this before you get to trial. |
| 14:37:23 | 20 | MR. KING:  I have thought through this, and I think I |
| 14:37:26 | 21 | can explain that.  The synchronization packet -- the purpose of |
| 14:37:29 | 22 | the synchronization packet in this patent -- and I shouldn't |
| 14:37:32 | 23 | set myself up for failure.  Maybe there's a better way to |
| 14:37:35 | 24 | explain it.  But I think the best analogy is you synchronize |
| 14:37:40 | 25 | your watch.  I receive that packet.  I say, Okay.  I've got a |

14:37:43  1  point.  I'm going to synchronize my watch now and I'm going to

14:37:46  2  listen carefully for that next data packet.  This is described

14:37:49  3  in the specifications.  I'm going to listen.  When it comes in,

14:37:51  4  I'm going to go okay.  That was X amount of time.  And based on

14:37:54  5  that, I can identify the device.

14:37:57  6       That's what the patent describes.  It describes it

14:38:00  7  throughout the specifications.  It describes it clearly in the

14:38:03  8  claims.  It doesn't say anything about what that

14:38:06  9  synchronization packet is other than start (snaps fingers).

14:38:09  10  Start the clock.  And when does it -- when you get that first

14:38:12  11  data packet or the second data packet in certain

14:38:15  12  implementations, you stop the clock.  And that's the whole

14:38:18  13  function of the patent.  That's what the patent is.  It's the

14:38:20  14  heart and soul of this patent.  It's very simple.

14:38:30  15       Does that answer your question, sir?

14:38:31  16       THE COURT:  No.  Well, other than the fact I want to

14:38:34  17  make sure I've read the charts correctly, the clock goes on at

14:38:36  18  the beginning of the synchronization packet but doesn't go off

14:38:45  19  until it gets the end of the data packet, or does it go off at

14:38:48  20  the beginning of the data packet?

14:38:50  21       MR. KING:  Well, I think the patent talks about

14:38:52  22  the -- that's getting to the heart of the construction, I

14:38:55  23  think, of the offset.  What is the offset?

14:38:57  24       THE COURT:  Yeah.  I just asked this question because

14:38:59  25  I'd seen it, and I thought it was a good place to ask the

14:39:03  1  question of how long does the clock stay on, because we were

14:39:05  2  talking about the clock.

14:39:06  3        MR. KING:  Yeah.  I think the -- the diagram in

14:39:09  4  figure 4 here seems to suggest that you're starting from the

14:39:15  5  arrival, the beginning, the front end of the signal from the

14:39:17  6  synchronization packet and you measure to the front end -- I'm

14:39:20  7  sorry.

14:39:20  8        THE COURT:  The question is not that hard.  Has the

14:39:22  9  receiving device gotten all of the information before it

14:39:28  10  determines that the data came from a portable phone?  Or does

14:39:41  11  it determine based on the time lapse that the data came from

14:39:44  12  the portable phone before it receives all the data?

14:39:48  13        MR. KING:  It's determined based on the time lapse.

14:39:50  14        THE COURT:  The time lapse from when to when?  From

14:39:51  15  the time it gets the synchronization packet to the time the

14:39:55  16  data packet begins or the time the data packet ends.

14:39:59  17        MR. KING:  I understand it to be from the time the

14:40:02  18  data packet begins.

14:40:03  19        THE COURT:  Okay.

14:40:04  20        MR. KING:  From the beginning to the beginning.

14:40:06  21        THE COURT:  Okay.

14:40:13  22        MR. KING:  Although I'm sure there are

14:40:14  23  implementations where you can -- if you knew how long the data

14:40:15  24  packet was, you could measure the time between the end of the

14:40:15  25  data packet -- of the synchronization packet and the beginning

14:40:19   1   of the data packet and you'd still be able to calculate an

14:40:22   2   offset because you'd know how long the data packet -- the

14:40:25   3   synchronization packet was.

14:40:26   4            THE COURT:  Dr. Akl knows all this, I think.

14:40:29   5            MR. KING:  He certainly does.

14:40:29   6            THE COURT:  He can tell you.

14:40:29   7            MR. KING:  He'll have an opportunity to explain it

14:40:31   8   better than I can.

14:40:32   9            Okay.  So the specification also supports it.  I

14:40:36  10   won't go over this it just basically tracks the same language

14:40:40  11   of the claim.  And, again, the specification talks about

14:40:43  12   receiving a device -- receiving device uses the offset between

14:40:47  13   the synchronization packet and data packet to identify the

14:40:51  14   wireless device which transmitted the data packet.  That's the

14:40:52  15   heart of the invention.

14:40:53  16            The only distinction the '247 patent makes between

14:40:57  17   the data packet and the synchronization packet is that one

14:41:00  18   follows the other.  And you won't find -- at least I haven't

14:41:04  19   been able to find anything in the specification that says

14:41:07  20   otherwise.

14:41:07  21            So Bandspeed's construction has a couple of problems

14:41:10  22   with it that I just want to point out quickly.  I think one of

14:41:13  23   the most important ones is they talk about the synchronization

14:41:17  24   packet being a discreet packet specifically designated to

14:41:21  25   contain only synchronization data.  I'm sure the Court's aware

14:41:26  1   of the problem with introducing a new element that requires the

14:41:29  2   action of somebody out -- somebody else.

14:41:32  3          Who is specifically designating this?  Is it the

14:41:36  4   method?  It the devices?  Is it some engineer who is

14:41:40  5   implementing the devices?  It creates numerous problems.  One

14:41:44  6   of the main ones is one of these claims is an apparatus claim.

14:41:49  7   And what this is it's introducing a method step into an

14:41:53  8   apparatus claim which would invalidate the patent.  And under

14:41:58  9   *IPXL*, which we've cited in our brief and I'm sure the Court's

14:42:00  10  familiar with it, that the courts should avoid trying to

14:42:05  11  introduce additional elements into a claim term that

14:42:09  12  invalidates the patent.  There's no reason to have this

14:42:12  13  specifically designated portion limitation.

14:42:15  14         They also add that it only contains synchronization

14:42:20  15  data.  That's not described anywhere in the patent, and it gets

14:42:24  16  to what we're talking about before.  The synchronization data,

14:42:27  17  it's not clear what that is because it's a different thing with

14:42:29  18  different protocols and it just adds ambiguity and confusion to

14:42:34  19  the claim.

14:42:35  20         And, finally, it's circular.  You're defining a

14:42:38  21  synchronization packet as a synchronization packet.

14:42:41  22         Let me talk again briefly about their reliance on the

14:42:44  23  prosecution history of the '727.  In the prosecution history,

14:42:53  24  there's a reference called *Robillard* which the patent examiner

14:42:58  25  has cited to the patentees in this later application.  And the

14:43:02  1    reference in *Robillard* sent timing beacons and -- they sent

14:43:10  2    them out, and the patentees basically argue that *Robillard*

14:43:16  3    fails to teach or suggest or disclose a synchronization packet

14:43:19  4    usable to synchronize data transmissions.  The patentee said

14:43:24  5    these timing beacons were not synchronization packets.

14:43:28  6          What Bandspeed argues is that the timing beacons are

14:43:32  7    signals.  I agree with that.  The timing beacons are not

14:43:35  8    synchronization packets.  I'm not sure that it's fair to read

14:43:39  9    this statement to the PTO for that proposition, but I'll give

14:43:43 10    it to them for purposes of argument.  And they say, therefore,

14:43:47 11    synchronization packets are not signals.

14:43:49 12          This is a just a pure logical false syllogism, and I

14:43:54 13    think it's easy to illustrate.  Timing beacons are signals.  We

14:43:58 14    agree on that.  Timing beacons are not synchronization

14:44:02 15    packets.  We agree on that.  Synchronization packets are not

14:44:05 16    signals.  Well, that does not make any sense.  They can

14:44:08 17    absolutely be signals, and I think that just illustrates it.

14:44:12 18          And what we've done here, you'll see the purple and

14:44:15 19    the blue.  The later application was talking about the meaning

14:44:19 20    of synchronization packets usable to the synchronize data

14:44:24 21    transmissions in the context of the '727 patent, which I think

14:44:28 22    is something very, very different than the synchronization

14:44:29 23    packets as stand-alone term as used in the '247 patent.

14:44:33 24          But, really, it's beside the point, because even if

14:44:34 25    they meant the same thing, this illustration, this Venn diagram

14:44:38  1  shows that their syllogism is just baseless and it certainly is

14:44:40  2  not a clear disavowal of claim scope.

14:44:43  3       "[First] data packet."  This is an example -- we

14:44:49  4  propose that first data packet is a signal used to transport

14:44:52  5  information.  They describe it as a discreet packet

14:44:55  6  specifically designated to contain only non-synchronization

14:44:58  7  data next follow the synchronization packet.

14:45:02  8       We -- I think this is an example where we did rely on

14:45:08  9  dictionary definitions because we thought that there were some

14:45:11 10  good definitions for "data" that made it clear that they're

14:45:13 11  talking about information.  And we agree that the first data

14:45:16 12  packet does have information in it.  We cite in our brief, our

14:45:20 13  opening brief, in Exhibit B to page 4 to a definition that we

14:45:24 14  think reflects the general idea that data is information.

14:45:29 15       THE COURT:  Both of you believe that that term

14:45:32 16  requires construction?  You don't think the trier of fact would

14:45:41 17  just know that what the first data packet was.  And if it was a

14:45:45 18  data packet, it was different from synchronization packet and

14:45:50 19  it was the first data received after the synchronization

14:45:53 20  packet?

14:45:54 21       MR. KING:  I think that -- if the Court decided not

14:45:56 22  to construe this term and gave it its plain and ordinary

14:46:01 23  meaning, I would be fine with that.

14:46:09 24       What Bandspeed has proposed is -- again, the

14:46:10 25  "specifically designated," that get to the various problems

14:46:13  1   that I discussed earlier about adding unwritten steps and

14:46:17  2   introducing method steps into apparatus claims.  They also add

14:46:22  3   the unsupported limitation that it contains only

14:46:26  4   non-synchronization data.

14:46:27  5        I want to just take a quick second for this because

14:46:29  6   there's -- as Mr. DiNovo was giving his presentation on the

14:46:33  7   technology, something struck me I hadn't thought of before.

14:46:36  8   They say the synchronization packet is a packet that has only

14:46:40  9   synchronization data, and they say that a data packet contains

14:46:44  10  only non-synchronization data.  But throughout all kinds of

14:46:49  11  wireless protocols, there are packets that include both

14:46:53  12  synchronization data as might be construed by somebody who's

14:46:57  13  familiar with the protocol and non-synchronization data in a

14:47:01  14  packet.

14:47:02  15       A good example is in modem technology, when you send

14:47:06  16  a signal -- pulse over of the modem, then there's information

14:47:10  17  in that packet that includes synchronization information.  And

14:47:14  18  part of that same packet is information about the information

14:47:16  19  we transmitted.  So is that packet a data packet?  No.  Because

14:47:21  20  it has synchronization data.  Is it a synchronization packet?

14:47:25  21  No.  Because it has non-synchronization data.  I mean, they --

14:47:29  22  there's just so much ambiguity introduced by this, kind of,

14:47:33  23  rigid, it's got to be X or Y.

14:47:36  24       The third unsupported limitation they add is next

14:47:39  25  following.  I think this is worth a second to talk about as

14:47:43  1   well.  The specification talks about in one example the data

14:47:48  2   packets 422 and 423 may originate from the same wireless

14:47:52  3   device.

14:47:53  4          Now, if you look at figure 4, you can see that you're

14:47:56  5   able to measure two offsets from these two data packets being

14:48:00  6   sent from the same device, one data packet following the

14:48:03  7   other.  So the idea that data packet 423 has to be the next

14:48:08  8   following the synchronization packet is -- it would exclude

14:48:15  9   this embodiment.  So I don't think it would be -- under

14:48:18  10  construction tenets, you don't introduce an unnecessary

14:48:24  11  limitation that excludes an embodiment.

14:48:27  12          The next proposed construction is "periodically."  It

14:48:32  13  appears only in claim two.

14:48:33  14          THE COURT:  Well, no.  Back up a minute.  Tell me why

14:48:37  15  it wouldn't be the next packet following the synchronization

14:48:44  16  packet.  If what the synchronization packet does is start the

14:48:47  17  clock and the clock counts, are you saying that there could be

14:48:51  18  something unrelated come in in the middle?  It wouldn't be the

14:48:56  19  next packet of information?

14:48:57  20          MR. KING:  What the specification is describing is

14:49:01  21  data packet 422 and 423 may originate from the same wireless

14:49:06  22  device, and the offsets 432 and 434 respectively may identify a

14:49:12  23  characteristic of the data being transmitted.  So it's an

14:49:15  24  embodiment that says you basically have two clocks where the

14:49:19  25  synchronization packet occurs and you measure, and when the

14:49:22  1   first data packet comes in, you stop the clock, when the second

14:49:25  2   data packet comes in you stop the clock.  And then you say,

14:49:29  3   okay.  Based on the different offsets, the first packet has

14:49:31  4   priority over the second.

14:49:33  5           That's only an embodiment that's described in the

14:49:37  6   patent and it's not in claim one.  I don't see this described

14:49:40  7   in claim one.  But it explains why the first data packet or the

14:49:44  8   data packet can't be the next following.

14:49:48  9           Proposed construction for "periodically" appears only

14:49:52  10  in claim two, and both parties rely on dictionary definitions

14:49:59  11  for this term.  You'll see Bandspeed picked dictionary

14:50:03  12  definition from Webster's dictionary which comes from -- the

14:50:11  13  citation they put in their papers, it says last visited

14:50:18  14  7/13/2005.

14:50:18  15          THE COURT:  The difference between the two of you is

14:50:20  16  the word "irregular"?

14:50:22  17          MR. KING:  Absolutely.  That's all.

14:50:24  18          THE COURT:  So why -- so don't worry about the

14:50:28  19  dictionaries.  Tell me why adding "irregular" makes it the

14:50:31  20  construction I should follow instead of just using "regular"

14:50:35  21  which is the construction urged by Bandspeed.  You word it

14:50:39  22  slightly differently, but that's the difference.

14:50:41  23          MR. KING:  Well, I'll tell you.  I think reading the

14:50:44  24  patent -- I'll be candid with the Court.  Reading the

14:50:48  25  specification and the claims, I don't think the specification

14:50:51   1   or the claims makes clear whether the "periodically" as used in

14:50:58   2   claim two is limited only to regular events or if it includes

14:51:04   3   irregular.  We think that -- that based on that, it would be

14:51:10   4   unjustified to pick the narrower construction.

14:51:13   5               THE COURT:  I thought, again, let's back up to

14:51:16   6   Dr. Akl.  I thought there was a need for there to be regularity

14:51:21   7   in order that the machine could check the list to find out what

14:51:29   8   it was getting from.  Now, if it's irregular, how do it know?

14:51:34   9               MR. KING:  That's an excellent question, and I do

14:51:36  10   have a slide for that.  Going through these definitions, you

14:51:40  11   can just see that some are regular and irregular.  But let's

14:51:44  12   talk about the reliance on the prosecution history, because

14:51:46  13   this gets to the core of that particular question.

14:51:48  14               They cite to this language in the prosecution

14:51:52  15   history.  And basically what they say is that there's a

14:51:56  16   predetermined offset, and the predetermined offset requires

14:52:02  17   that there be a fixed interval that you're looking at and that

14:52:07  18   the -- that "periodic" needs to have a defined timing.

14:52:13  19               I don't disagree with that.  Because when you're

14:52:16  20   looking at offsets, if you're going to do what Dr. Akl

14:52:19  21   described, looking at a table and trying to say, I've got an

14:52:23  22   offset between sync and data packet and I'm going to compare it

14:52:28  23   to the time in my tables and from that I'm going to figure out

14:52:31  24   what device it is, you need to have a very precise, fixed

14:52:34  25   offset -- a predetermined offset as described here.

14:52:38  1          So what they cite to supports that position and I

14:52:41  2  think gets to the question Your Honor asked.  But claim two

14:52:46  3  where "periodically" appears has nothing to do with offsets.

14:52:50  4  It talks about the method of claim one further comprising

14:52:53  5  listening for said synchronization packet periodically within a

14:52:58  6  predetermined window of time.

14:53:00  7          THE COURT:  Where --

14:53:01  8          MR. KING:  It has nothing to do with offsets.

14:53:04  9          THE COURT:  Is that the only context in which

14:53:06  10 "periodically" occurs in the patent?

14:53:08  11         MR. KING:  "Periodically" is also cited in the

14:53:11  12 specification talking about synchronization packets being sent

14:53:15  13 periodically.  And in that context it's described-in the

14:53:19  14 paragraphs which describe, they talk about it's -- at least in

14:53:24  15 my view, it's not clear whether "periodically" is describing

14:53:29  16 synchronization packets being set at specific intervals or

14:53:33  17 whether the synchronization packet can be sent when I reach to

14:53:36  18 hit my keyboard after sitting for a month.  That

14:53:39  19 synchronization packet, is that a periodic synchronization

14:53:43  20 signal?  I think it is.  The patent also talks about periodic

14:53:44  21 synchronization signals being sent every set period of time.

14:53:46  22         THE COURT:  So in the application of the patent,

14:53:48  23 again, what difference does it make if it's regular intervals

14:53:55  24 or it's regular or irregular intervals?

14:53:58  25         MR. KING:  For the --

| | | |
|---|---|---|
| 14:54:00 | 1 | THE COURT:  What do you mean by irregular intervals, |
| 14:54:02 | 2 | since that's what you want? |
| 14:54:03 | 3 | MR. KING:  I think what I mean by that is probably |
| 14:54:07 | 4 | best expressed here.  We think that the idea of having a |
| 14:54:12 | 5 | keyboard sitting there waiting for somebody to hit the keyboard |
| 14:54:16 | 6 | to send the synchronization signal captures what we've |
| 14:54:22 | 7 | highlighted here in orange, and that's at slide 61.  Occurring |
| 14:54:26 | 8 | repeatedly from time to time; reoccurring, intermittent, like a |
| 14:54:33 | 9 | drinking spree.  There's a time when I'm going to hit my |
| 14:54:37 | 10 | keyboard and I'm going to send a sync signal to the receiver. |
| 14:54:42 | 11 | And that's not going to be at a set time.  It's going to be |
| 14:54:45 | 12 | when I reach over and hit my keyboard. |
| 14:54:47 | 13 | I think the patent envisions synchronization signals |
| 14:54:51 | 14 | being sent in that way.  As I said, and I think it's worth |
| 14:54:55 | 15 | emphasizing, that claim one is not talking about sending |
| 14:54:57 | 16 | synchronization packets.  It's talking about listening for |
| 14:55:00 | 17 | them, which is a different thing.  But I still think the term |
| 14:55:00 | 18 | means the same thing throughout the patent, so it should mean |
| 14:55:03 | 19 | both regular and irregular intervals. |
| 14:55:05 | 20 | Okay.  "Timing offsets" and "offset."  I don't want |
| 14:55:13 | 21 | to speak for Mr. DiNovo, but in my view -- |
| 14:55:15 | 22 | THE COURT:  Oh, don't worry.  He'll correct you. |
| 14:55:18 | 23 | MR. KING:  Maybe he won't.  Maybe I'm right about |
| 14:55:21 | 24 | this one.  But in my view, I don't think there's really much of |
| 14:55:24 | 25 | a difference in what we understand "offset" or "timing offset" |

14:55:32  1   to be.  It's the period between two signals as described

14:55:37  2   throughout the patent and the claims and the specifications.

14:55:41  3        We characterize that offset as a delay between the

14:55:45  4   signals, and they've taken issue with that.  They have come up

14:55:50  5   with a construction that we take issue with, because I think

14:55:54  6   it's unnecessarily complex and very convoluted and only adds a

14:55:59  7   tremendous amount of ambiguity to the claims.

14:56:02  8        Just for clarity, these terms appear at claims 1 and

14:56:07  9   20, and they also appear through incorporation of claims 2, 8,

14:56:10 10   9, 10, 25, and 26.  So we think our construction is the correct

14:56:20 11   construction.  Again, we've been over this, so I won't spend a

14:56:24 12   lot of time with it.  The patent and its specifications and its

14:56:25 13   claims and its figures talks about receiving data packet -- I'm

14:56:27 14   sorry -- receiving a synchronization packet, receiving a data

14:56:31 15   packet, calculating an offset, and using the offset -- the

14:56:35 16   difference between those in time between those two devices to

14:56:43 17   identity the device.

14:56:44 18        Here's a number of places in slide 70 that show how

14:56:47 19   this is described in various ways throughout the specification,

14:56:51 20   always talking about an offset between a synchronization packet

14:56:55 21   and a data packet in time.

14:56:56 22        Their construction, I think one of the flaws in their

14:57:00 23   construction is that it begins with a measurement immune to

14:57:04 24   time.  And I think that's redundant and unnecessary because the

14:57:07 25   claim itself talks about the offset being measured from the

14:57:11  1   synchronization packet by a first amount of time.  So you're

14:57:15  2   introducing the notion of a measurement of time when the claim

14:57:18  3   inherent in the language of the claim is this measurement of

14:57:21  4   first amount of time.  So I think that the -- that just is an

14:57:25  5   example of how the definition adds a level of redundancy that I

14:57:32  6   think is very confusing and unnecessary.

14:57:36  7        It also lacks clarity, and this gets to Your Honor's

14:57:40  8   question earlier.  It talks about measurement of units of time,

14:57:44  9   the difference between the initial time of the receipt.  That

14:57:48 10   looks like what they're looking at there is something akin to

14:57:51 11   what's described in offset 432.  But it also talks about the

14:57:55 12   initial time of receipt between packets.  And "between packets"

14:57:59 13   could be understood by a juror or by the Court or by anyone as

14:58:03 14   being the end of the synchronization packet and the beginning

14:58:07 15   of the data packet.  I think inherent in that definition are

14:58:10 16   those two conflicting ideas which I think is really unnecessary

14:58:15 17   for understanding the claim.

14:58:17 18        So claim construction, as the Court well knows and we

14:58:22 19   cited here examples of this and should make the claim easier

14:58:26 20   for the jury to understand.  I think just to illustrate the,

14:58:29 21   kind of, fundamental flaws of Bandspeed's constructions, this

14:58:32 22   is what the claim looks like, replacing all the terms that

14:58:36 23   they've asked to be construed with their constructions.

14:58:39 24   They've basically completely rewritten the claim, and it's

14:58:42 25   incomprehensible in our view.  And I think that we feel that

14:58:45  1  this isn't going to further the purposes of claim

14:58:48  2  construction.

14:58:49  3         Not to disparage Bandspeed -- I think they have good

14:58:54  4  reasons for all their constructions, I'm sure, as Mr. DiNovo

14:58:57  5  will explain to us, but I think the net result is this, which I

14:59:00  6  don't think is helpful.

14:59:01  7         The last term that I'll touch on is the "host

14:59:04  8  processor environment."  It appears at claim 25, which is a

14:59:13  9  dependent claim -- dependent on claim 20.  Our definition is, a

14:59:18  10  general purpose processor running an operating system.  Their

14:59:21  11  definition is a general purpose computer to which the wireless

14:59:24  12  apparatus can interface as a peripheral.  I'll start with our

14:59:30  13  construction.

14:59:31  14         What we did, we came up with this.  We basically

14:59:34  15  found in the specification where it describes the host

14:59:37  16  processor environment at column 3, lines 62 through 66.  And it

14:59:42  17  describes it as e.g., a general purpose processor such as

14:59:47  18  Pentium class processor, running an operating system such as

14:59:52  19  Windows NT.

14:59:53  20         THE COURT:  All right.  What do you perceive the

14:59:54  21  difference between a processor and a computer could be?

14:59:58  22         MR. KING:  I think there's a huge difference.  And

15:00:00  23  that's --

15:00:00  24         THE COURT:  Is a processor less or more than a

15:00:03  25  computer?

| | | |
|---|---|---|
| 15:00:03 | 1 | MR. KING:  This is a computer.  This device here is a |
| 15:00:07 | 2 | computer (indicating).  In there is a processor.  There are |
| 15:00:10 | 3 | multiple processors, actually, in this computer.  And |
| 15:00:13 | 4 | there's -- there's probably a graphics processor.  There's |
| 15:00:16 | 5 | probably an arithmetic logic unit in there that's a different |
| 15:00:22 | 6 | kind of processor.  There's probably half a dozen different |
| 15:00:25 | 7 | processors in this computer.  And calling it a computer versus |
| 15:00:29 | 8 | processor adds a lot -- many layers of ambiguity and confusion, |
| 15:00:36 | 9 | I think.  So we tried to tie our proposed construction |
| 15:00:38 | 10 | carefully to the specification, and this is what we came up and |
| 15:00:41 | 11 | we think it fairly describes what the patent describes. |
| 15:00:44 | 12 | They enter this, first, an unnecessary limitation |
| 15:00:48 | 13 | because they start by saying, The wireless apparatus can |
| 15:00:52 | 14 | interface.  And, again, the wireless apparatus that they're |
| 15:00:56 | 15 | talking about here is the apparatus claimed in claim 20. |
| 15:01:01 | 16 | And, unfortunately, I didn't put the image up here, |
| 15:01:04 | 17 | but I think it might be helpful if the Court had figure 3 from |
| 15:01:08 | 18 | the patent in front of him because it describes some of this |
| 15:01:12 | 19 | stuff that would make it easy to understand. |
| 15:01:14 | 20 | The host processor environment interfaces with the |
| 15:01:17 | 21 | wireless apparatus as claimed in claim 25.  And under tenets of |
| 15:01:25 | 22 | construction, there's no reason to add a limitation that |
| 15:01:29 | 23 | already exists.  The claim itself requires that the host |
| 15:01:33 | 24 | processor environment interface with the apparatus, so why |
| 15:01:38 | 25 | introduce "the wireless apparatus can interface" in the claim |

15:01:42  1  itself?  You're just adding redundancy that adds to the

15:01:46  2  confusion and increases the opportunities for the jury to

15:01:50  3  misunderstand the claim.

15:01:53  4          They also talk about the computer, which is the host

15:01:57  5  interface environment in their construction interfacing as a

15:02:01  6  peripheral.  Now, again, if you look at figure 3, you'll see

15:02:05  7  that the -- the host processor environment interfaces with the

15:02:12  8  apparatus as described here.  And that's the -- the

15:02:16  9  construction.  Now, if you look at -- I'm sorry.  This is a

15:02:20  10  slide that Mr. DiNovo presented in his technical tutorial.  His

15:02:25  11  slide of the technical tutorial, his slide 11, shows figure 3

15:02:31  12  and they put box around certain things.  And they put some

15:02:34  13  boxes around what I think Mr. DiNovo, at least based on their

15:02:39  14  arguments in their brief, were pointing to as peripherals.

15:02:44  15  Those are devices that are connected wirelessly to the

15:02:49  16  apparatus.

15:02:50  17          The host processor environment connects to an

15:02:53  18  interface of the apparatus and then these peripherals are out

15:02:54  19  here.  But this seems to suggest that the apparatus -- that the

15:02:57  20  computer is interfacing with the apparatus as a peripheral.  It

15:03:04  21  didn't make any sense.  And beyond that, "peripheral" is a very

15:03:09  22  ambiguous term which probably requires construction itself.

15:03:12  23          And, lastly, it gets to the Court's question, a

15:03:15  24  general purpose computer.  I apologize about the color of

15:03:20  25  that.  It didn't come out very well.  But a general purpose

15:03:21    1    computer is not a processor.  And to try and interpret this in

15:03:28    2    terms of a computer versus a processor has a great deal of

15:03:31    3    confusion, I think, for the jury.

15:03:33    4            So, once again, in summary, these are the seven terms

15:03:36    5    that we propose for construction.  These are the constructions

15:03:39    6    we propose, and we respectfully request that the Court adopt

15:03:43    7    the construction we propose.  And thank you for your time.

15:03:46    8            THE COURT:  Thank you.

15:03:47    9            Mr. DiNovo do you need just a minute to set up?

15:03:51    10           MR. DINOVO:  Only if you do, Your Honor.

15:03:57    11           THE COURT:  We'll take about five minutes and let you

15:04:00    12    discuss what hardware you're going to use.  And let you get

15:04:03    13    organized whatever you want to organize.

15:04:06    14       (Recess)

15:17:31    15           THE COURT:  Mr. DiNovo, you shouldn't need more then

15:17:34    16    about two minutes to tell me, "It just isn't so."  Have I

15:17:38    17    summed up your argument --

15:17:39    18           MR. DINOVO:  You have, Your Honor.

15:17:41    19           THE COURT:  -- adequately?

15:17:42    20           MR. DINOVO:  We deny everything.

15:17:43    21           To join the issues in the case -- and I know it's

15:17:48    22    Friday afternoon, and the Court and probably everyone in the

15:17:52    23    courtroom is interested in expediting our argument.  We thought

15:17:56    24    it would be useful to refer to CSR's slides, which I think the

15:17:59    25    Court has before it?

| | | |
|---|---|---|
| 15:18:01 | 1 | THE COURT:  I do. |
| 15:18:02 | 2 | MR. DINOVO:  So first of all, there is a general |
| 15:18:10 | 3 | characterization of a lot of our evidence as extrinsic |
| 15:18:14 | 4 | evidence.  And two of the categories of that evidence that were |
| 15:18:17 | 5 | so characterized are the Bluetooth specification and the |
| 15:18:20 | 6 | prosecution history of the application to which we direct the |
| 15:18:25 | 7 | Court's attention.  With respect to the Bluetooth |
| 15:18:27 | 8 | specification, I would point out to the Court in the '247 |
| 15:18:31 | 9 | patent the very detailed reference to the Bluetooth |
| 15:18:33 | 10 | specification in column 1 and background of the invention. |
| 15:18:36 | 11 | And, in fact, it even calls out a particular |
| 15:18:40 | 12 | Bluetooth protocol architecture document as part of the |
| 15:18:43 | 13 | background of the invention.  It refers specifically to the |
| 15:18:46 | 14 | Bluetooth specification, multiple communication layers in that |
| 15:18:50 | 15 | specification, and the final statement for what is needed in |
| 15:18:54 | 16 | terms of this invention is a system and method which will work |
| 15:18:58 | 17 | seamlessly with the Bluetooth protocol. |
| 15:19:01 | 18 | Now, that having been said, we do not contend that |
| 15:19:04 | 19 | this -- the patent claims are limited to Bluetooth.  But what |
| 15:19:09 | 20 | we do contend is that the specification refers to the -- the |
| 15:19:13 | 21 | specification of the '247 patent refers to the Bluetooth |
| 15:19:18 | 22 | specification explicitly and that it is part of the intrinsic |
| 15:19:21 | 23 | record to understand what the background of this invention is. |
| 15:19:23 | 24 | And so we think it is fully fair game for us to refer to the |
| 15:19:27 | 25 | Bluetooth specification which is referred to repeatedly here to |

15:19:31  1   understand what is meant by these relevant terms.

15:19:33  2          The second issue that is characterized as extrinsic

15:19:37  3   evidence is the prosecution history.  We've briefed this.  It's

15:19:40  4   our view that related applications, as pointed out in several

15:19:46  5   cases we've cited, do have relevance to the claim construction

15:19:51  6   process.  I think there's a little bit of lack of specificity

15:19:56  7   as to how we're referring to it.  So there were a couple of

15:20:01  8   comments made about the fact that it's not specific enough to

15:20:05  9   disavow a claim scope, and that's a *Scimed* reference to

15:20:07 10   prosecution history disavowal.  We're not arguing that.

15:20:10 11          We're also not arguing prosecution history estoppel,

15:20:14 12   as pointed out in slide 18.  That relates to whether or not the

15:20:17 13   doctrine of equivalence can extend beyond something that has

15:20:21 14   been modified.

15:20:22 15          What we are arguing is that patentee used the term

15:20:25 16   "packet", for example, in a very specific way.  And he used it

15:20:29 17   in a way that we think is consistent with all of the

15:20:33 18   definitions that they put up in slide 30.  And that is that

15:20:36 19   it's digital; that it's a unit; that it's transmitted; that

15:20:39 20   it's binary.

15:20:45 21          THE COURT:  All right.  Let me ask you right there,

15:20:47 22   because there was some discussion during the tutorial phase of

15:20:51 23   this about that this could also deal with equipment that

15:20:57 24   operates over a wire and potentially an analog transmission.

15:21:02 25   Is it your argument that it has to be binary, or can it apply

15:21:06   1   to analog transmissions and receptions?

15:21:09   2          MR. DINOVO:  So I think that we have a fundamental

15:21:11   3   disagreement.  And, actually, I didn't hear this in

15:21:15   4   Dr. Akl's presentation.  I heard it in the argument.

15:21:18   5          THE COURT:  Well, wherever it appeared, focus me,

15:21:23   6   since you have brought this up, on why it only has a digital or

15:21:29   7   binary application as opposed to some other application.

15:21:34   8          MR. DINOVO:  A packet -- so I do agree that there's

15:21:37   9   no discussion of what the contents of the packet are, with the

15:21:41  10   exception of "data packet."  I will direct the Court's

15:21:43  11   attention to that.  But with the synchronization packet, all we

15:21:47  12   know is that it's a packet and that it's used for

15:21:50  13   synchronization.  That having been said, the context of the

15:21:53  14   packet and of -- so the Court has to understand that term,

15:21:56  15   since it's not explicitly defined from, the context of person

15:22:00  16   of ordinary skill in the art.  And that can be informed by

15:22:03  17   dictionary definitions.

15:22:05  18          The one we have directed to, and we can refer to

15:22:07  19   slide 30, is the first definition in the IEEE dictionary.  And

15:22:11  20   that's particularly salient because the IEEE is a group to

15:22:15  21   which CSR belongs and participates.  And the definition one

15:22:20  22   you'll see that there's a parenthetical.  It's labeled "com."

15:22:25  23   That relates to communications.  So this definition is a

15:22:28  24   communications definition for "packet."

15:22:30  25          But as I pointed out, he was intending to criticize

15:22:34  1  us for ignoring the other definitions.  Every single one of

15:22:40  2  these is digital, so it doesn't matter which one is used.  A

15:22:44  3  packet is not an analog signal.

15:22:47  4          And the other statement that was made is --

15:22:50  5          THE COURT:  All right.  Then let me ask you, then, if

15:22:54  6  what you say is what is in the patent as a whole, why does not

15:23:01  7  "a signal" get it as a definition?

15:23:05  8          MR. DINOVO:  Yes, sir.

15:23:05  9          THE COURT:  Why do we have to have the lengthier

15:23:09  10  definition to specifically say "group of binary digits" if only

15:23:17  11  binary digits are used.

15:23:19  12          MR. DINOVO:  Well, let me give you an academic answer

15:23:22  13  and then a practical answer, if I can.

15:23:24  14          THE COURT:  All right.  I'll understand the academic

15:23:27  15  answer, and we'll let the jury hear the practical answer.

15:23:31  16          MR. DINOVO:  All right.  The academic is that a

15:23:33  17  signal would include more than a packet.  A signal can include

15:23:36  18  any sort --

15:23:37  19          THE COURT:  I haven't been able to get you guys to

15:23:39  20  tell me what's in a packet or why we use the term "packet."

15:23:42  21          MR. DINOVO:  So do you want me to show you the

15:23:45  22  example in the Bluetooth specification of a packet?

15:23:49  23          THE COURT:  Well, this kind of gets back to what I've

15:23:51  24  tried to get, and I'm going to treat you every bit as rudely as

15:23:55  25  I treated Mr. King so he'll feel good about that.  But, you

15:23:59  1  know, when I hear "packet" -- I'm a juror.  I'm sitting over

15:24:01  2  there, and somebody says "packet."  I think it's a little type

15:24:04  3  of thing with something in it.  I think that's different than

15:24:08  4  my pushing a button and shocking you.

15:24:11  5          But when we talked about synchronization packet, I

15:24:14  6  haven't heard anything that's in a packet.  I haven't heard

15:24:18  7  it's anything different from pushing a button and it sends

15:24:22  8  something out that just tells the receiving device to turn the

15:24:26  9  clock on.  So is it more than that?  Is it less than that?

15:24:30  10          MR. DINOVO:  So a packet in our world view has to be

15:24:34  11  digital.  So this is important.

15:24:36  12          THE COURT:  Okay.  Okay.

15:24:36  13          MR. DINOVO:  Because it has to contain bits, ones and

15:24:41  14  zeros.  A packet under their terminology is a signal, and so it

15:24:45  15  would include, for example, your buzzer in your hand.  And so

15:24:48  16  that's not a digital signal.  That could be amplitude

15:24:53  17  modulated.

15:24:55  18          THE COURT:  So that's your difference between a

15:24:59  19  signal.  Your -- in your view, a packet must contain binary

15:25:10  20  digits?

15:25:11  21          MR. DINOVO:  It's conceivable that a packet could

15:25:13  22  contain other types of digital data, but that's probably not

15:25:17  23  really worth worrying about.  But it would contain digital

15:25:21  24  data.  And there's been a statement that everything over the

15:25:24  25  wire is analog.  That's false, and our expert will tell you

| | | |
|---|---|---|
| 15:25:29 | 1 | that under oath. |
| 15:25:30 | 2 | The modulation that occurs between the digital signal |
| 15:25:35 | 3 | and putting something over the air or putting something over |
| 15:25:38 | 4 | copper is simply putting it in a format that it can be |
| 15:25:43 | 5 | communicated effectively, but it is still digital data and not |
| 15:25:47 | 6 | analog data, unless it's converted from a digital-analog |
| 15:25:52 | 7 | conversion, but there's not been any discussion of that.  It's |
| 15:25:55 | 8 | not true that merely because it goes over the air it's analog. |
| 15:26:00 | 9 | That's not true.  And, by the way, their patent nowhere speaks |
| 15:26:02 | 10 | to any sort of analog signal. |
| 15:26:05 | 11 | THE COURT:  All right.  So where I am here is I |
| 15:26:07 | 12 | understand the argument that "signal" may be too broad because |
| 15:26:11 | 13 | a signal can contain other things.  You say it has to contain |
| 15:26:16 | 14 | digital data.  So why do we have to go to the, what I feel, |
| 15:26:21 | 15 | somewhat strained definition of "a group of binary digits, |
| 15:26:27 | 16 | which is switched, if at all, and transmitted as a composite |
| 15:26:30 | 17 | whole"?  Why couldn't it be, "a signal consisting only of |
| 15:26:35 | 18 | binary digits"? |
| 15:26:36 | 19 | MR. DINOVO:  Well, actually I think Your Honor's |
| 15:26:40 | 20 | intuition was correct about what a packet is.  It's kind of a |
| 15:26:42 | 21 | thing.  It's a unit.  And it is transmitted as such.  And like |
| 15:26:45 | 22 | in the Internet, it can be routed around as a unit.  And that's |
| 15:26:50 | 23 | to be distinguished from the example I gave earlier which was, |
| 15:26:53 | 24 | for example, a modem -- an old-time modem where you hear all of |
| 15:26:58 | 25 | the ones and zeros going through and makes it squeal.  That is |

| | | |
|---|---|---|
| 15:27:02 | 1 | not a packet.  So it is possible to have a digital data that is |
| 15:27:05 | 2 | not a packet.  And I encourage this question to be asked of |
| 15:27:09 | 3 | anyone at CSR, whether it's possible to have ones and zeros |
| 15:27:13 | 4 | that are not packetized.  And I think the answer would be, of |
| 15:27:16 | 5 | course it is. |
| 15:27:17 | 6 | So a packet has a known meaning.  There are variances |
| 15:27:21 | 7 | in it according to context.  We think the most accurate context |
| 15:27:24 | 8 | is the packet as described in the communications definition in |
| 15:27:27 | 9 | the IEEE and the packet that's depicted in the Bluetooth |
| 15:27:32 | 10 | specification which is referred to in the background of an |
| 15:27:34 | 11 | invention and as an object of the invention to be seamlessly |
| 15:27:39 | 12 | integrated with.  But, regardless, all of them are shuttled |
| 15:27:43 | 13 | around, if you will, as a unit. |
| 15:27:51 | 14 | THE COURT:  Well, I will tell you that I am |
| 15:27:53 | 15 | suspicious of a dictionary definition that has 12 different |
| 15:27:58 | 16 | definitions, of picking one of them out and saying that is what |
| 15:28:02 | 17 | a person reasonably skilled in the art would believe this |
| 15:28:05 | 18 | definition was.  That's the problem we get into with dictionary |
| 15:28:12 | 19 | definitions. |
| 15:28:13 | 20 | MR. DINOVO:  And I agree with Your Honor.  And |
| 15:28:15 | 21 | *Phillips*, which I think is the gold standard of claim |
| 15:28:19 | 22 | construction that was an *en banc* decision in the Federal |
| 15:28:21 | 23 | Circuit also expresses some concern about dictionary |
| 15:28:25 | 24 | definitions.  The problem we're left with based on this |
| 15:28:29 | 25 | intrinsic record is the author simply expects the reader to |

15:28:35  1   understand what a packet is.  And so we refer to dictionaries

15:28:37  2   to elucidate that problem.

15:28:40  3         THE COURT:  Well, I always look at a tenet of

15:28:44  4   construction of being able to take a definition and substitute

15:28:53  5   it for the word where the word is used or the phrase is used

15:28:57  6   and have it make sense.  I have a hard time everywhere "packet"

15:29:01  7   is used substituting "a group of binary digits which is

15:29:05  8   switched, if at all, and transmitted to a composite as a

15:29:09  9   composite whole" and having it make sense to me when I try to

15:29:14  10  put that in where it occurs within the patent.

15:29:19  11        MR. DINOVO:  It would be cumbersome, Your Honor,

15:29:21  12  but -- but I don't think a jury is going to understand what a

15:29:24  13  packet is absent that.  I also don't think the jury is going to

15:29:28  14  be faced with something like what they have on the screen,

15:29:31  15  where you simply plug in the term over and over.  They will

15:29:35  16  read the construction once, and they will apply that

15:29:38  17  construction to the claim.

15:29:39  18        THE COURT:  When we are trying this case, what are

15:29:48  19  the respective arguments going to be if I were to use the word

15:29:51  20  "signal"?  How does that affect the respective arguments and

15:29:56  21  cases on the merits?  Because one of the things that is

15:30:00  22  problematic to most judges that handle patent cases is trying

15:30:04  23  to get the lawyers focused on the way the case is going to be

15:30:08  24  tried other than, Let's fight this battle over here, then let's

15:30:12  25  fight this battle up here.  And as you-all well know, that is

15:30:18  1   one of the frustrations I have in this case, is trying to

15:30:21  2   get -- now that it's grown exponentially between California and

15:30:26  3   Arizona and Marshall, focused on how we're actually going to

15:30:30  4   try the case.  So what difference does it make at the end of

15:30:34  5   the day to your case or Mr. King's case if we're saying

15:30:42  6   "signal" or "a group of binary digits"?

15:30:44  7            MR. DINOVO:  All right, Your Honor.  And I think that

15:30:46  8   was the practical example I was going get to, but I went off on

15:30:50  9   a tangent.

15:30:51  10            THE COURT:  You can go ahead and get there.

15:30:53  11            MR. DINOVO:  Okay.  So one of their examples in their

15:30:57  12   tutorial was microwave oven.  A microwave oven generates energy

15:31:02  13   because it wants to warm your food up.  It's not creating

15:31:06  14   information that somebody wants to receive, but a microwave

15:31:09  15   oven can nonetheless interfere with signals.  And so their

15:31:12  16   signal, as I understand it based on their tutorial, they're

15:31:15  17   attempting to say that the energy generated from a microwave

15:31:20  18   oven is a packet -- a synchronization packet and a data

15:31:24  19   packet.  We don't think so.  We don't think a person of

15:31:27  20   ordinary skill would have that meaning at all.

15:31:29  21            Similarly, radar.  Radar detection that's occurred

15:31:34  22   for decades, we want to determine whether someone is trying to

15:31:37  23   find our planes.  That radar detection, they would say that's a

15:31:41  24   packet.  It's not a packet.  It's simply a blip.

15:31:44  25            And so that's the distinction.  Are these blips or

15:31:49  1   this random energy that's generated to heat food, is that a

15:31:52  2   packet?

15:31:55  3              THE COURT:  Well, that gets back to what I've been

15:31:58  4   trying to get to most of the afternoon, is what is in a

15:32:03  5   synchronization packet?  Do you know?

15:32:05  6              MR. DINOVO:  It has to be something in our assessment

15:32:09  7   that is used -- again, there's no specificity in the patent.

15:32:14  8   So what we do know is that it is a special type of patent --

15:32:18  9   excuse me -- a special type of packet that is distinguished

15:32:21  10  from a data packet.  And the special type of packet is sent,

15:32:24  11  such as in the context of this unilateral communication, to let

15:32:29  12  the receiver know now it's time to listen for data packets.

15:32:34  13  And so I think Mr. King said that there is nothing in the

15:32:37  14  specification that characterizes either the synchronization

15:32:40  15  packet or the data packet.  That's not the case.  The data

15:32:43  16  packet in column 4, lines 39 through 41 is described in this

15:32:47  17  way:  The data packet contains the underlying data to be

15:32:51  18  processed by the receiving device and/or the host processor.

15:32:54  19              So we know that the data packet has to have

15:32:56  20  underlying data that can be processed by the receiving device

15:33:00  21  and/or the host processor.  That's explicit in the patent.

15:33:04  22              The synchronization packet tells the receiver you

15:33:07  23  better listen for the data packet.  And the idea -- the

15:33:11  24  reason --

15:33:11  25              THE COURT:  Does it tell it to listen for a

| | | |
|---|---|---|
| 15:33:13 | 1 | particular type of data packet, or does it just say once the |
| 15:33:20 | 2 | signal is received, that there's a data packet on its way?  You |
| 15:33:25 | 3 | know, I'm back to where I started with synchronization packet. |
| 15:33:28 | 4 | Does it do no more than start a clock, or does it alert the |
| 15:33:31 | 5 | receiving device to more than starting the clock? |
| 15:33:36 | 6 | MR. DINOVO:  The patent doesn't give a lot of |
| 15:33:39 | 7 | specificity about what the specification -- |
| 15:33:41 | 8 | THE COURT:  No.  But y'all argue about whether |
| 15:33:42 | 9 | there's infringement or not infringement.  So -- |
| 15:33:47 | 10 | MR. DINOVO:  We think -- |
| 15:33:47 | 11 | THE COURT:  -- that's got to come up at some point. |
| 15:33:50 | 12 | MR. DINOVO:  We think a fair reading of this is that |
| 15:33:53 | 13 | the synchronization packet contains some sort of control |
| 15:33:56 | 14 | information that -- |
| 15:33:57 | 15 | THE COURT:  Which is inexplicable. |
| 15:33:59 | 16 | MR. DINOVO:  -- which is un-characterized, and it |
| 15:34:02 | 17 | tells the receiving device now is the time to listen for a data |
| 15:34:05 | 18 | packet, which is a different kind of packet.  And so there are |
| 15:34:09 | 19 | two different kinds of packets, a synchronization packet, wake |
| 15:34:14 | 20 | up, a data packet is coming soon.  That's all we know. |
| 15:34:18 | 21 | It doesn't -- in our assessment, it doesn't contain |
| 15:34:21 | 22 | data, which is data to be operated by the host device.  Because |
| 15:34:25 | 23 | at the point, upon receipt of the sync packet, the receiving |
| 15:34:29 | 24 | device isn't listening for data.  So if there were data |
| 15:34:33 | 25 | transmitted in the synchronization -- |

| | | |
|---|---|---|
| 15:34:34 | 1 | THE COURT:  Unless it's synchronization data. |
| 15:34:37 | 2 | MR. DINOVO:  That's true, Your Honor. |
| 15:34:38 | 3 | THE COURT:  Because you want that in there.  Once you |
| 15:34:40 | 4 | open the box on data, then somebody on the jury is going to |
| 15:34:47 | 5 | wonder if you've used the word "data," although it will be me |
| 15:34:52 | 6 | using the word "data" if I accept your construction, what type |
| 15:34:57 | 7 | of data is it?  And so far nobody can tell me that.  So why |
| 15:35:00 | 8 | would I put "data" as part of the definition? |
| 15:35:04 | 9 | MR. DINOVO:  Well, it has to have some information |
| 15:35:07 | 10 | such that it knows -- and by the way, we can go through the |
| 15:35:10 | 11 | prosecution history and maybe this is a good point for me to |
| 15:35:13 | 12 | launch into my presentation and I'll try to do so very |
| 15:35:15 | 13 | quickly.  But the timing beacon of the *Robillard* reference was |
| 15:35:20 | 14 | explicitly excluded from same.  So a timing beacon is a -- not |
| 15:35:25 | 15 | a packet, not a digital creature.  It was simply saying, okay. |
| 15:35:30 | 16 | We're going to send you a packet.  And the patentee said, No, |
| 15:35:33 | 17 | no.  That's not a synchronization packet.  That's timing |
| 15:35:38 | 18 | beacon. |
| 15:35:39 | 19 | So we think that is very strong evidence that the |
| 15:35:41 | 20 | patentee at the time of obtaining the patent was saying that a |
| 15:35:45 | 21 | synchronization packet is a digital creature having a certain |
| 15:35:48 | 22 | format and that is different than a timing beacon. |
| 15:35:52 | 23 | If I could, maybe -- well, let me just make a final |
| 15:35:56 | 24 | few points.  On slide 55 Mr. King says that -- that there's the |
| 15:36:12 | 25 | possibility of measuring an offset from a second data packet. |

15:36:16  1   That -- that embodiment is claimed in a claim that they have

15:36:19  2   not asserted that's claim 13 having a second data packet.  And

15:36:27  3   claim -- I believe Mr. King said that he agrees that -- that

15:36:31  4   claim one doesn't have a second offset or it's not measuring

15:36:37  5   data -- or the characteristics of the signal based on the

15:36:40  6   offset.  So that really isn't at issue, but it is claimed in a

15:36:45  7   separate claim.

15:36:46  8            Slide 58 there was discussion about the periodic

15:36:55  9   nature of the listening.  And I believe Mr. King said, Well you

15:36:58 10   know, you can hit a keyboard and it might just send it then.

15:37:01 11   But that's not what "periodic" refers to in claim two.  It

15:37:04 12   refers to not the sending of the packet, but the listening for

15:37:07 13   a packet.  And if you recall the notion that this is a -- one

15:37:10 14   of the problems that was attempted to be solved by the '247

15:37:13 15   patent was that you may only have unilateral or unidirectional

15:37:18 16   communication.  The idea was that you could send the

15:37:23 17   synchronization packet, but the only way that would be detected

15:37:27 18   by the host computer, for example, is if it's listening for it

15:37:30 19   on a periodic basis.

15:37:36 20            THE COURT:  So I'll be honest with you.  I don't

15:37:39 21   understand what effect defining "periodic" is going to mean on

15:37:44 22   this case.  How often does it appear in the patent, and what

15:37:50 23   does it really refer to?  What difference does it mean -- does

15:37:54 24   it make whether it's regular or irregular, even by your

15:38:03 25   position that it refers to listening for a packet.  What --

15:38:07  1   what effect does "periodically" have?  I just can't find it

15:38:14  2   having that big of a difference in here.

15:38:16  3          MR. DINOVO:  Well, it's only in reference to

15:38:18  4   claim two of the asserted claims.

15:38:20  5          THE COURT:  I don't understand why that's a disputed

15:38:23  6   claim, but go ahead.  You can explain it.

15:38:26  7          MR. DINOVO:  Well, I think the answer is that the

15:38:29  8   periodicity of claim two would -- would encompass only devices

15:38:34  9   that were listening on a regular routine basis and not devices

15:38:38  10  that were --

15:38:38  11         THE COURT:  What does "listening on a regular routine

15:38:40  12  basis" mean?  If I'm sitting here with this computer on, am I

15:38:44  13  listening?

15:38:45  14         MR. DINOVO:  You as a human being?

15:38:47  15         THE COURT:  Is my computer listening?  Yeah.  Is

15:38:50  16  there something to come tell it something?

15:38:51  17         MR. DINOVO:  So the way Bluetooth works generally,

15:38:54  18  and I'm happy to be corrected because I'm not an expert, is

15:38:57  19  that there's a synchronization.  And this is described in the

15:39:00  20  background section of the patent.  And the patent actually

15:39:03  21  talks about it being a continuous synchronization.  It

15:39:07  22  describes it as a periodic as well, where it's always

15:39:09  23  happening.  And so that -- that sort of continuous

15:39:13  24  communication is required unless, according to the '247 patent,

15:39:19  25  you send on -- you send whenever needed --

| | | |
|---|---|---|
| 15:39:22 | 1 | THE COURT:  Continuous communication between what? |
| 15:39:27 | 2 | The thing I have in my ear and the thing I have in the |
| 15:39:30 | 3 | dashboard of my car? |
| 15:39:32 | 4 | MR. DINOVO:  Yes, sir. |
| 15:39:33 | 5 | THE COURT:  All right.  So if that's both on.  Okay. |
| 15:39:37 | 6 | Now, describe "regular" and "irregular" as it applies to |
| 15:39:44 | 7 | periodically, then. |
| 15:39:46 | 8 | MR. DINOVO:  So regular and irregular, regular |
| 15:39:49 | 9 | would -- so one of the most common examples of period movement |
| 15:39:53 | 10 | is a pendulum.  And so that is referred to as periodic |
| 15:39:59 | 11 | movement.  All the dictionary definitions -- and I understand |
| 15:40:02 | 12 | there's problems.  But all of the dictionary definitions that |
| 15:40:05 | 13 | we cite that are scientific in nature, in addition to the |
| 15:40:10 | 14 | Merriam Webster dictionary, I'll refer to it being with a set |
| 15:40:13 | 15 | time interval.  Non-periodic or a-periodic would refer to |
| 15:40:17 | 16 | something that happens only when needed. |
| 15:40:19 | 17 | So, for example, in the Bluetooth bilateral |
| 15:40:21 | 18 | communication mode, you -- because the receiver is synced to |
| 15:40:27 | 19 | the transmitter in an active way, it doesn't have to be |
| 15:40:31 | 20 | listening.  It will send it on a channel that it knows I will |
| 15:40:35 | 21 | send it on and at a time that it knows I will send it.  And so |
| 15:40:39 | 22 | it's kind of an ad hoc communication that is -- because of the |
| 15:40:43 | 23 | synchronization, it can happen when you want. |
| 15:40:46 | 24 | THE COURT:  All right.  I reach over my dashboard and |
| 15:40:49 | 25 | I turn off my ability to receive phone calls in my car.  Now |

| | | |
|---|---|---|
| 15:40:56 | 1 | there was talk when Mr. King was presenting about turning on a |
| 15:41:02 | 2 | computer and turning off a computer.  How does that fit?  Do we |
| 15:41:06 | 3 | no longer worry about regular or irregular if the -- if a |
| 15:41:10 | 4 | device on one end or the other is turned off? |
| 15:41:18 | 5 | MR. DINOVO:  Well, -- |
| 15:41:18 | 6 | THE COURT:  Or is your argument on regularity, does |
| 15:41:21 | 7 | that only occur when a sending device and a receiving device |
| 15:41:28 | 8 | are both on? |
| 15:41:29 | 9 | MR. DINOVO:  Well, the method -- so method claim |
| 15:41:32 | 10 | would have to be practiced.  And so when -- if both devices are |
| 15:41:37 | 11 | off, then, presumably, no steps are being taken. |
| 15:41:41 | 12 | THE COURT:  Okay.  How about if one of them is off? |
| 15:41:43 | 13 | MR. DINOVO:  If one of them was off, the method |
| 15:41:46 | 14 | appears to me, according to claim two, to being carried out by |
| 15:41:50 | 15 | the receiving device because it says listening for said |
| 15:41:54 | 16 | synchronization packet periodically within a predetermined |
| 15:41:57 | 17 | window of time. |
| 15:41:58 | 18 | And so, basically -- and these numbers are |
| 15:42:01 | 19 | arbitrary -- it says let's listen for a synchronization packet |
| 15:42:05 | 20 | every tenth of a second or every ten seconds and see if we hear |
| 15:42:09 | 21 | it.  And if we don't, then we'll check again later. |
| 15:42:13 | 22 | THE COURT:  Well, "later" kind of conjures up |
| 15:42:20 | 23 | irregularity to me. |
| 15:42:22 | 24 | MR. DINOVO:  The system would not operate based on -- |
| 15:42:25 | 25 | based on their objective here, which is that the -- there's no |

15:42:30  1  bilateral or bidirectional communication.  The system would not

15:42:33  2  operate effectively –– and I think that the way the patent

15:42:37  3  discusses it –– without the receiver listening with regularity,

15:42:41  4  because the receiver does not know when the transmitter is

15:42:44  5  going to send it.

15:42:45  6          And the –– by the way, Your Honor, you're asking

15:42:50  7  about practical.  I'm not trying to get into too much argument,

15:42:52  8  but it's our understanding that CSR doesn't claim they practice

15:42:56  9  this invention.  And as far as we're aware, no one does it this

15:42:59  10 way.  So if you're asking for real–world examples of how this

15:43:03  11 is actually implemented, I don't think there are any.

15:43:07  12          THE COURT:  Well, you're going to have to do

15:43:09  13 something with the jury to make them think that this is not

15:43:14  14 just some ephemeral deal out there.  They're going to bring

15:43:18  15 their real–world experiences, too, which is a problem that I

15:43:21  16 find I have with patent lawyers from time to time.  But you're

15:43:26  17 going to have to get this down to where they're going to

15:43:31  18 understand what you're talking about, not just CSR saying we

15:43:34  19 invented this wonderful thing and we don't use it.

15:43:41  20          And you're saying, well, you know, they're accusing

15:43:47  21 us of infringing on it, but they're not using it.  Is that what

15:43:50  22 the argument is going to be at trial?

15:43:52  23          MR. DINOVO:  No, Your Honor.  I think what we're

15:43:54  24 going to say –– because, apparently, they're going to claim

15:43:58  25 that microwaves are packets, we're going to say that packets

| | | |
|---|---|---|
| 15:44:01 | 1 | aren't microwave signals.  That to the extent we try to |
| 15:44:03 | 2 | identify sources of noise based on microwaves in the vicinity |
| 15:44:06 | 3 | of a Wi-Fi network, that's not a synchronization packet and a |
| 15:44:10 | 4 | data packet. |
| 15:44:11 | 5 | THE COURT:  I understand that.  I'm back to why is |
| 15:44:13 | 6 | claim two and the word "periodically" important to the two of |
| 15:44:21 | 7 | you? |
| 15:44:22 | 8 | MR. DINOVO:  It's a scope of the claim.  And if |
| 15:44:24 | 9 | you're asking about specifics, obviously, it's our contention |
| 15:44:27 | 10 | that we don't infringe at all.  But, I mean, I think the |
| 15:44:30 | 11 | general -- |
| 15:44:34 | 12 | THE COURT:  Of course, there's a large part of this |
| 15:44:36 | 13 | lawsuit where it's your contention -- their contention that |
| 15:44:39 | 14 | they don't infringe on you at all. |
| 15:44:41 | 15 | MR. DINOVO:  That's correct. |
| 15:44:49 | 16 | THE COURT:  And somebody is going to get tagged for |
| 15:44:51 | 17 | an awful lot of money at the end of the day, but that's the way |
| 15:44:53 | 18 | the systems go. |
| 15:44:54 | 19 | MR. DINOVO:  That's true, Your Honor.  I think if |
| 15:44:56 | 20 | you're asking about real-world implication of this on our case, |
| 15:45:00 | 21 | we don't think that claim two makes a material difference.  But |
| 15:45:02 | 22 | we do feel confident that "periodic" in the context of any |
| 15:45:07 | 23 | scientific writing has a certain meaning and we're right about |
| 15:45:12 | 24 | it. |
| 15:45:12 | 25 | THE COURT:  Okay. |

15:45:42 1          MR. DINOVO:  So very briefly, let me go over some

15:45:43 2 points we haven't discussed in my presentation.  I think I

15:45:44 3 mentioned this, but the '247 patent, there's been a lot of

15:45:46 4 discussion about analog and wireless being the same, which we

15:45:49 5 disagree with.  But in any case, the '247 patent nowhere speaks

15:45:52 6 to analog communication.  The term "packet" connotes explicit

15:45:57 7 digital structure, and there's no discussion of "packet" being

15:46:03 8 analog.

15:46:04 9          It's interesting in their brief, and some of it --

15:46:08 10 Mr. King mentioned some of this in his presentation.  They

15:46:14 11 refer to a packet as a signal but almost acknowledging that the

15:46:17 12 signal is overbroad, they say, Well, if there's a definition

15:46:21 13 that we like on slide 30, it's this block.  And they say the

15:46:24 14 use of a block to transmit data.  And so that's not so far from

15:46:29 15 what we proposed, except that it -- well, at least it contains

15:46:33 16 data and it's a block.  But it's not explicitly digital, and

15:46:38 17 it's not switched as a block.  That appears to be the

15:46:40 18 distinction.  But they don't seem to have a philosophical

15:46:44 19 aversion to at least some of our -- some of our construction.

15:46:48 20          THE COURT:  And I've said I think "signal" may be a

15:46:52 21 little broad, but I think your definition is a little

15:46:56 22 unwieldy.  I would wish that you could get together, because my

15:47:02 23 other problem is, as I've said, a person ordinarily skilled in

15:47:07 24 the art, which of the 12 definitions is he going to take?

15:47:10 25 Which means one of you needs to tell me the definition of who

15:47:16  1  the person ordinarily skilled in the art is in this case.  Is

15:47:20  2  he an electrical engineer with three years of practical

15:47:28  3  experience?  Who is the person ordinarily skilled in the art?

15:47:32  4  Because you can line up ten people of skill in electrical

15:47:36  5  engineering, and we might get ten of them picking ten different

15:47:41  6  of the 12 definitions out of there.

15:47:44  7          See, that's the difficulty I have in trying to

15:47:47  8  reconcile when I have two definitions, neither -- or proposed

15:47:53  9  constructions, neither one of which I think exactly gets

15:47:57 10  there.  Then it's up to me to come up with what it is.  And

15:48:02 11  unless I know who the person ordinarily skilled in the art is,

15:48:07 12  I don't know what definition he is likely to choose.

15:48:11 13          I do believe that "a block of information that is

15:48:15 14  transmitted within a single transfer operation" does come

15:48:20 15  closer than either one of your definitions does.

15:48:23 16          MR. DINOVO:  The block of information transmitted --

15:48:26 17  transmitting data, if the block of information is digital data,

15:48:31 18  then that does come closer.  But I -- I understand the Court's

15:48:35 19  concern about competing dictionary definitions.  I would simply

15:48:40 20  point out that the IEEE dictionary definition that we pointed

15:48:43 21  to was the one that's pertinent to communications, and also

15:48:47 22  that the specification specifically calls out the Bluetooth

15:48:51 23  specification as its context and says that it is to work

15:48:56 24  seamlessly with that specification.  And so we have submitted

15:48:59 25  what that data structure looks like, and it is absolutely

15:49:02  1   consistent in every respect with ours.

15:49:04  2          And I would refer again the Court's attention to the

15:49:06  3   *Phillips* case.  We've been accused of importing unnecessary

15:49:11  4   limitations.  We don't think that's true at all.  We're just

15:49:16  5   trying to set forth what a packet means to the inventor.  And,

15:49:19  6   of course, the Phillips case gives ultimate weight to the

15:49:22  7   specification and says that claims must be read in view of the

15:49:26  8   specification of which they're a part.  And, usually, it's

15:49:29  9   dispositive.  It's the single best guide to the meaning of a

15:49:31  10  disputed term.

15:49:32  11         So it wasn't us that referred to the Bluetooth

15:49:35  12  specification.  It was them that did it repeatedly and gives a

15:49:38  13  context for what "packet" means.

15:49:47  14         The examiner in the prosecution history -- and I'll

15:49:50  15  go over this briefly because we've discussed it -- said that

15:49:53  16  the prosecution did -- the patent specification doesn't even

15:49:57  17  refer to receiving a signal.  It refers only to creating a

15:50:01  18  packet.  And Mr. King had an interesting spin on it.  He was

15:50:05  19  saying, Well, they must have understood at the time that it was

15:50:07  20  the same thing.

15:50:08  21         That's not, I don't think, how a person would have a

15:50:10  22  fair reading of the prosecution history.  A think a fair

15:50:13  23  reading of the prosecution history is the examiner saying

15:50:15  24  there's no discussion of signal here absent a packet.  And the

15:50:19  25  response of the patentee was pulling the reference to signal

| | | |
|---|---|---|
| 15:50:23 | 1 | altogether.  And he didn't say at the time, Well, of course |
| 15:50:26 | 2 | "packet" and "signal" are the same thing.  He just said, Okay. |
| 15:50:29 | 3 | I'll pull my reference to "signal," and that's that.  Of |
| 15:50:38 | 4 | course, if the patentee uses different terms, they're presumed |
| 15:50:41 | 5 | to mean different things. |
| 15:50:45 | 6 | By the way, there was a reference to the fact that we |
| 15:50:48 | 7 | called one patent a parent of the other.  The actual history or |
| 15:50:55 | 8 | posture of the two patents is they both claim priority to the |
| 15:50:59 | 9 | same provisional application.  So the declarant said that they |
| 15:51:02 | 10 | both shared common subject matter with that application, and |
| 15:51:07 | 11 | they are family members in that sense. |
| 15:51:19 | 12 | CSR also said something interesting that I think we |
| 15:51:21 | 13 | can understand where they're going with this, which is that, |
| 15:51:25 | 14 | well, of course packets sometimes contain sync data and -- |
| 15:51:30 | 15 | synchronization information and data payloads.  Well, that was |
| 15:51:36 | 16 | the prior art that's disclosed here, is the Bluetooth |
| 15:51:38 | 17 | specification had a packet that had information -- control |
| 15:51:42 | 18 | information at the front and data information in the second |
| 15:51:44 | 19 | part.  And that was all in one packet in digital construct that |
| 15:51:48 | 20 | had very clear definitions and number of bytes. |
| 15:51:51 | 21 | And the invention, the whole invention is, we're not |
| 15:51:53 | 22 | going to do that.  We're going to put a sync packet over here, |
| 15:51:59 | 23 | send it, and then have a data packet over here.  So we're going |
| 15:52:01 | 24 | to segregate those.  So, yes, we are saying that they have to |
| 15:52:05 | 25 | be segregated because that's what the core of the invention is. |

```
15:52:08   1            THE COURT:  I don't have a problem with that.  I just
15:52:10   2   can't figure out what goes in the sync packet.  Apparently,
15:52:14   3   nobody else can either.
15:52:19   4            MR. DINOVO:  Just with the data packet, a signal used
15:52:22   5   to transport information, essentially, they're eviscerating the
15:52:25   6   whole term "packet."  And so now it's a signal, as we've
15:52:28   7   discussed.  And used to transport information --
15:52:31   8            THE COURT:  I'll ask you what I asked Mr. King:  Why
15:52:35   9   do we have to construe that term?  "First data packet" seems to
15:52:40   10  me to be really clear and plain.  How can it ever be anything
15:52:47   11  else other than the packet that is received after the receiver
15:52:52   12  has told to expect the data packet?
15:52:54   13           MR. DINOVO:  If we have a construction of "packet,"
15:52:57   14  then that gets us a long way, because obviously the parties
15:53:01   15  have a disagreement about what a packet is.  The second
15:53:05   16  reason --
15:53:05   17           THE COURT:  But do you have a greater definition --
15:53:08   18  greater disagreement other than whether it's binary or binary
15:53:12   19  and analog?
15:53:13   20           MR. DINOVO:  Yes.  We think it has to be -- they use
15:53:16   21  the term "block."  We say it has to be a set or an ordered set
15:53:20   22  of data in a structure, binary data, that is essentially
15:53:24   23  switched or transmitted.  They use the term "single transfer."
15:53:27   24           THE COURT:  I thought you said you could live with
15:53:28   25  "block" if it said a block of binary data.
```

15:53:32  1              MR. DINOVO:  We think it has to be transmitted and

15:53:35  2      switched as a single unit.  The problem with "transmitted as a

15:53:39  3      single unit" and where we expect this disagreement to go is

15:53:43  4      things like modems, which aren't packets by any normal

15:53:47  5      understanding.  And so you start it, and the transmission lasts

15:53:51  6      a minute and then it's over.  That's not a packetized digital

15:53:57  7      data transmission.  It has to be something that can be routed

15:54:00  8      because it is a packet.  It's treated as a unit by the

15:54:03  9      communications network.  That's the whole notion of a packet.

15:54:06  10             So the concern is "transmitted as a unit," what does

15:54:09  11     that mean?  They're going to say it would include things that

15:54:12  12     are not conventional packets is our fear.

15:54:15  13             THE COURT:  Well, it says in definition number nine

15:54:18  14     out of the IEEE dictionary, a block of information is

15:54:22  15     transmitted with a single transfer operation.

15:54:24  16             You say based on my -- on everybody's review of the

15:54:28  17     patent that I should accept the position that that block of

15:54:33  18     information has to be binary information or a block of binary

15:54:39  19     digits.  What's wrong with the rest of that definition if I go

15:54:42  20     that way.

15:54:43  21             MR. DINOVO:  It's not inaccurate.  We think it's

15:54:45  22     incomplete because it doesn't talk about the switching.  I

15:54:48  23     think the issue will become, Your Honor, what is a transfer

15:54:51  24     operation?  I think there is clearly digital data that is not

15:54:56  25     packetized that can be communicated in one session, if you

| | | |
|---|---|---|
| 15:55:00 | 1 | will.  I'm going to send you a fax, and it's all going to come |
| 15:55:03 | 2 | in two minutes.  And the question then becomes, is that a |
| 15:55:07 | 3 | single transfer operation or not?  We think introducing the |
| 15:55:10 | 4 | notion of switching makes it clear that it can be routed and it |
| 15:55:13 | 5 | is treated as a cohesive unit by the communications network as |
| 15:55:17 | 6 | opposed to just a stream of ones and zeros, which is a |
| 15:55:19 | 7 | non-packetized digital communication. |
| 15:55:25 | 8 | The second reason that we think data -- data |
| 15:55:28 | 9 | packet -- |
| 15:55:28 | 10 | THE COURT:  Might as well alert your clients to how |
| 15:55:31 | 11 | much this is going to cost, because this case is going to go to |
| 15:55:34 | 12 | the Federal Circuit at least one time.  After you finish |
| 15:55:36 | 13 | spending the millions of dollars to try the case, it's going to |
| 15:55:39 | 14 | come back, and it may come back two or three times.  This is |
| 15:55:43 | 15 | not going to end in my lifetime -- I can tell you that -- if |
| 15:55:47 | 16 | you-all can't get closer in agreeing on how these things work, |
| 15:55:52 | 17 | because this is going to be like every other case that goes to |
| 15:55:55 | 18 | the Circuit. |
| 15:55:56 | 19 | I'm going take my shots and I'm going to give my |
| 15:55:58 | 20 | definitions and you're going to try it.  And then it's going to |
| 15:56:01 | 21 | go up there, and they're going to dig down in it and find for |
| 15:56:05 | 22 | one side or the other or both something that I've made a |
| 15:56:08 | 23 | mistake on, because they do that in 65 to 70 percent of the |
| 15:56:12 | 24 | cases.  And then it's going to come back, and we're going to |
| 15:56:15 | 25 | pick it up at some stage and we're going to try it again.  And |

15:56:17   1    it's going to go up again, and then it's going to come back

15:56:20   2    again.

15:56:21   3            And I hope you-all have focused on it, because that's

15:56:24   4    what's going to happen.  I am not going to reach a perfect

15:56:28   5    bulletproof result in this case because judges don't do it in

15:56:31   6    patent cases.  So everyone would be better off, particularly in

15:56:35   7    this particular iteration of this case, the '297 patent, to try

15:56:39   8    to come closer on agreeing on some of these definitions.

15:56:43   9            MR. DINOVO:  Well, on the term "packet," Your Honor,

15:56:49   10   we actually had some discussions which I'll not reveal.

15:56:51   11           THE COURT:  You don't need to reveal.

15:56:53   12           MR. DINOVO:  But it may warrant further discussion

15:56:55   13   between us that we can try to do over the next week or so.

15:56:59   14           THE COURT:  All right.

15:57:02   15           MR. DINOVO:  But Your Honor did ask why we think data

15:57:04   16   packet needs to be construed.  I do think it has a plain and

15:57:08   17   ordinary meaning.  But the reason we wanted to construe it, and

15:57:10   18   our fears have been realized, I think that CSR wants to say

15:57:14   19   that a sync packet and a data packet can be the same signal.

15:57:17   20   So, for example, in a radar or microwave or what have you, it

15:57:21   21   can be the same signal.  And we think the patent -- a fair

15:57:24   22   reading of the patent is that they're different, that a sync

15:57:26   23   packet and a data packet are two different animals.  And so --

15:57:31   24           THE COURT:  Mr. King, did you say that?

15:57:32   25           MR. KING:  Well, I need to hear it back again, but --

15:57:35  1          THE COURT:  All right.  Hear it back again, because

15:57:37  2   what I understood you to say and Dr. Akl to say and with what

15:57:41  3   you put on the board during the tutorial, on the screen, that

15:57:45  4   there were different frequencies, and that was the wavy lines

15:57:52  5   going between the towers depending on what kind of device was

15:57:56  6   transmitting.  And then there were different intervals,

15:58:01  7   offsets, if you will, between the time the synchronization

15:58:05  8   packet hit and the data packet hit.

15:58:09  9          And I didn't hear you saying -- and I'll ask

15:58:13 10   Mr. DiNovo to repeat that, but I didn't hear you saying that

15:58:17 11   all of these are the same.  If I missed that, today is the day

15:58:21 12   I need to know that.  So go ahead, Mr. DiNovo, and say what you

15:58:25 13   were going to say.  And I'll let Mr. King interrupt you because

15:58:28 14   I want to hear what he thinks he told me and whether I'm

15:58:31 15   getting it or whether I'm not.

15:58:33 16          MR. DINOVO:  Okay.  And one point of clarification.

15:58:35 17   I didn't mean to say the same signal, but what I meant to say

15:58:39 18   was --

15:58:39 19          THE COURT:  That is what you said.

15:58:40 20          MR. DINOVO:  Well, I do mean the same type of

15:58:42 21   signal.  So, for example, when they're talking about little

15:58:47 22   blurbs of microwave oven and they're saying we're going to

15:58:49 23   measure the offset between these two, there's no difference

15:58:51 24   between those two blurbs.  One is the same as the next.  So I'm

15:58:56 25   not saying they're the same one in time, but these are the same

15:59:00  1   energy pulses, if you will.

15:59:01  2             THE COURT:  But different frequencies though.

15:59:04  3             MR. KING:  Can I respond to that?

15:59:05  4             THE COURT:  Yeah.

15:59:05  5             MR. KING:  I think that Mr. DiNovo keeps referencing

15:59:09  6   microwave, and I think that's a great illustration to

15:59:11  7   illustrate the difference in our opinion.  He says that I see

15:59:14  8   microwave noise from a microwave oven as being synchronization

15:59:20  9   data packets.  What the receiver hears is just a blur of

15:59:26  10  information coming from this device that's operating.  That's

15:59:30  11  not what we're talking about here.

15:59:32  12            I'm talking about and the patent is talking about

15:59:35  13  just discreet blocks of signal that are being sent from

15:59:38  14  devices.  And if you looked at Mr. Akl's tutorial, he was

15:59:43  15  showing how these devices send blocks of signals, frequency

15:59:48  16  blasts, at different timing intervals, and that you could

15:59:52  17  identify this source based on the timing intervals being

15:59:56  18  blasts.  That's not microwave ovens.  So just so there's no

16:00:00  19  confusion about that, we're not saying that a device sitting in

16:00:03  20  the corner --

16:00:03  21            THE COURT:  Perhaps y'all helped create the confusion

16:00:06  22  by having microwave ovens and radar in your tutorial.

16:00:09  23            MR. KING:  And the reason we did that, Your Honor, is

16:00:12  24  just to explain -- Dr. Akl was just illustrating the point that

16:00:16  25  all of these devices create noise in a similar frequency band.

| | | |
|---|---|---|
| 16:00:20 | 1 | He was just -- that wasn't to illustrate the patent.  That was |
| 16:00:23 | 2 | just to describe the problem -- one of the problems that in |
| 16:00:25 | 3 | this room, there might be any number of devices that are |
| 16:00:28 | 4 | sending signals or just leakage from operation that are within |
| 16:00:33 | 5 | the same frequency band. |
| 16:00:34 | 6 | THE COURT:  So you're willing to tell Mr. DiNovo that |
| 16:00:37 | 7 | we're not going to litigate microwave ovens when we come to |
| 16:00:41 | 8 | trial? |
| 16:00:41 | 9 | MR. KING:  I can say that with some confidence. |
| 16:00:44 | 10 | THE COURT:  Are you comfortable now? |
| 16:00:46 | 11 | MR. DINOVO:  Well, that gets us a long way, but |
| 16:00:48 | 12 | there's another issue here which I think is the same issue. |
| 16:00:51 | 13 | Which I said they think the synchronization packet and the data |
| 16:00:54 | 14 | packet can be the same.  And so, for example -- |
| 16:00:56 | 15 | THE COURT:  I didn't hear you say that. |
| 16:00:57 | 16 | MR. KING:  I didn't say that. |
| 16:00:58 | 17 | THE COURT:  Are you arguing to me that the |
| 16:01:01 | 18 | synchronization packet and data packet will be the same? |
| 16:01:03 | 19 | Because I believe I heard you say, regardless of how I construe |
| 16:01:07 | 20 | these claims, there's always going to be an offset between the |
| 16:01:12 | 21 | synchronization packet and the data packet. |
| 16:01:14 | 22 | MR. KING:  Correct. |
| 16:01:14 | 23 | THE COURT:  All right.  Then that's what -- |
| 16:01:16 | 24 | MR. DINOVO:  So I think maybe I'm not being clear |
| 16:01:19 | 25 | when I say the same.  I mean the same type of signal.  So we |

16:01:23  1  think the synchronization packet is one type of data, and

16:01:26  2  the --

16:01:28  3          THE COURT:  All right.  You first said same signal.

16:01:30  4  Now, are you talking about the data that's contained in the

16:01:33  5  synchronization packet, which nobody can tell me anything

16:01:36  6  about, as being distinct from the data that's in the data

16:01:42  7  packet which perhaps somebody can tell me about?

16:01:45  8          MR. DINOVO:  Yes, Your Honor.  We have very limited

16:01:48  9  information about the synchronization packet, but we know that

16:01:50  10 it contains some sort of data that is used for

16:01:53  11 synchronization.  And we know that the data packet has data

16:01:56  12 that is used for processing by the host.

16:01:57  13         THE COURT:  Does it matter or does what this device

16:02:00  14 do is just interface with things like Bluetooth and doesn't

16:02:06  15 make its own decision as to what the synchronization data is?

16:02:11  16 It just passes it along?  My question, therefore, being:  Do

16:02:14  17 you have any idea what the synchronization data is?

16:02:17  18         MR. KING:  I believe I do, and I believe it's

16:02:20  19 explicit in the patent, that the synchronization packet is a

16:02:24  20 blast of signal that the device that's operating the method, or

16:02:30  21 the method, uses to start the clock to time the offset.  It's

16:02:35  22 described throughout.  It's described in the claims.  It's that

16:02:38  23 simple.

16:02:38  24         THE COURT:  All right.  And that is not then

16:02:41  25 contained in the data packet.

16:02:43  1          MR. KING:  The data packet marking the end so you can

16:02:47  2  identify the offset.  The data packet is distinct from the

16:02:50  3  synchronization signal.  Now, the synchronization signal

16:02:51  4  arrived, you start the clock.  You receive the data packet,

16:02:54  5  which is a distinct, separate event.  You measure the offset,

16:02:57  6  and you can identify the source of data.

16:03:00  7          THE COURT:  All right.  You know the source of the

16:03:01  8  data.  But the data packet really has data in it.  It's the

16:03:05  9  kind of thing that the receiver wants to get to work with; is

16:03:08  10  that right?

16:03:09  11          MR. KING:  I think that's right.

16:03:10  12          MR. DINOVO:  So the problem is you didn't ask whether

16:03:12  13  the synchronization packet has data that it wants to work

16:03:15  14  with.  The problem we have based on the briefing is that they

16:03:19  15  read "synchronization packet" and "data packet" simply to mean

16:03:23  16  packet one and packet two and the receiver decides whether

16:03:28  17  they're sync and the data packet.  And then they just measure

16:03:30  18  an offset between the two, and they don't actually have any

16:03:32  19  specific meaning outside of a numbering system.

16:03:35  20          And so, in other words, it's a sequence of data

16:03:37  21  packets one and two, not that "synchronization packet" has a

16:03:40  22  certain type of control information associated with

16:03:44  23  synchronization and the data packet has a certain type of data

16:03:46  24  that is to be processed by the underlying processor.  That's

16:03:49  25  our contention.  That's why we proposed a construction for

16:03:52  1   "data packet," because we wanted to distinguish it from

16:03:55  2   "synchronization packet."

16:03:56  3          MR. KING:  And the patent is explicit, that when it

16:03:59  4   receives a packet, it -- the method is describing starting the

16:04:04  5   clock, finding an offset, identifying a device.  Now, that's

16:04:08  6   what the method is describing.  Whether that -- that first

16:04:11  7   packet includes data that device one might want to be

16:04:16  8   communicating to the receiving device isn't relevant to the

16:04:19  9   practice of this patent.  What's relevant to the practice of

16:04:22  10  the patent is it receives a signal, it goes (snaps fingers),

16:04:24  11  got to start the clock, going to wait for the next one, going

16:04:27  12  to measure the difference, and I'm going to be able to identify

16:04:30  13  the source of that information -- the source of those

16:04:33  14  transmissions based on that.

16:04:35  15         That's what the claims talk about.  That's what the

16:04:38  16  specification talks about.  That's why we're both having such a

16:04:41  17  hard time pointing to what in the patent is synchronization

16:04:44  18  information, because the patent doesn't talk about it.  It

16:04:47  19  doesn't care.  The data, that first packet, can be a packet of

16:04:51  20  whatever.  The method is -- that's practicing the invention is

16:04:56  21  treating that as a synchronization packet because it's starting

16:04:59  22  the clock.  And that's -- that's what the patent is describing.

16:05:03  23         THE COURT:  All right.  So Mr. DiNovo is just an

16:05:07  24  alarmist when he says he's going to hear at trial that the

16:05:11  25  receiver processes some kind of data from the synchronization

| | | |
|---|---|---|
| 16:05:16 | 1 | packet? |
| 16:05:17 | 2 | MR. KING:  I think he's an alarmist. |
| 16:05:19 | 3 | THE COURT:  Okay. |
| 16:05:19 | 4 | MR. KING:  I mean, the purpose of the method -- |
| 16:05:21 | 5 | THE COURT:  There you go. |
| 16:05:22 | 6 | MR. KING:  The purpose of the method is that packet |
| 16:05:26 | 7 | has a function in the practice of the patent, and that's just |
| 16:05:29 | 8 | to identify an offset. |
| 16:05:30 | 9 | MR. DINOVO:  I think the problem we have with what |
| 16:05:33 | 10 | Mr. King is saying is that I think he is saying that the |
| 16:05:37 | 11 | synchronization packet and the data packet are simply labels |
| 16:05:40 | 12 | put on by the receiver; that they're not different types of |
| 16:05:44 | 13 | packets.  So the synchronization packet in his world view can |
| 16:05:47 | 14 | be identically structured to the data packet.  It may even have |
| 16:05:53 | 15 | the exact same data in it.  I think that's -- again, I think |
| 16:05:56 | 16 | what they're saying is basically "synchronization packet" and |
| 16:05:58 | 17 | "data packet" could have, in the patentee's parlance, simply |
| 16:06:01 | 18 | been replaced by "packet one" and "packet two" and measuring an |
| 16:06:04 | 19 | offset between packet one and packet two. |
| 16:06:07 | 20 | MR. KING:  I think I can illustrate an example that |
| 16:06:11 | 21 | would help the Court understand why -- |
| 16:06:11 | 22 | THE COURT:  Let me tell you, if I'm having trouble |
| 16:06:13 | 23 | getting to the crux of this, I want you to think about the |
| 16:06:18 | 24 | people that are going to be sitting in those chairs having |
| 16:06:21 | 25 | trouble getting to the crux of it.  Because I've spent no small |

16:06:26  1  amount of time on this, and today I'm having a hard time

16:06:31  2  getting questions answered about how it works.

16:06:36  3         Part of it is because I don't know, and part of it is

16:06:39  4  because I'm trying to get you to explain things simply, which

16:06:43  5  patent lawyers have a real problem doing.  And I mean that the

16:06:51  6  way it sounds.  Y'all do a great job hiding the ball from the

16:06:54  7  Court and not ever getting to the point that the Court wants.

16:06:58  8  But you've got to understand it doesn't matter what you think

16:06:58  9  the patent says or what the inventor thinks the patent says.

16:07:02  10  You need to focus on what the Court needs to construe it.

16:07:05  11         And if you're not getting it across to the Court,

16:07:08  12  you're not going to get it across to the jury.  And then you

16:07:13  13  really don't know what's going to happen, and then the whole

16:07:15  14  thing goes to Washington as a mess.  And that's the problem in

16:07:18  15  a lot of patent cases, and this the poster child for my getting

16:07:24  16  all kinds of conflicting information and no agreements and no

16:07:28  17  straight answers out of anybody.  So now give me your example.

16:07:31  18         MR. KING:  Well, I'm doing my best to give straight

16:07:34  19  answers, and I apologize that I've been unable to be clear.

16:07:38  20  But I think a good example would be if a device sends a data --

16:07:45  21  two packets, and they send the same packet, and they send the

16:07:49  22  same information in the packets to a receiver.  Now, for

16:07:52  23  purposes of the patent, what the patent is describing, the

16:07:57  24  receiver receives the first packet, starts the clock, receives

16:08:00  25  the second packet and goes based on that --

| | | |
|---|---|---|
| 16:08:03 | 1 | THE COURT:  So it doesn't matter what is in the first |
| 16:08:05 | 2 | packet.  All it does is start the clock.  It can be exactly |
| 16:08:10 | 3 | what's in the data packet. |
| 16:08:11 | 4 | MR. KING:  That's what I'm saying.  I think in a |
| 16:08:13 | 5 | particular application, I don't know what it would be.  But |
| 16:08:15 | 6 | generally -- |
| 16:08:16 | 7 | THE COURT:  But what the patent does is turn on -- |
| 16:08:18 | 8 | MR. KING:  It looks at the offset and it says, based |
| 16:08:20 | 9 | on that offset -- it's set in the claims.  Claim one is pretty |
| 16:08:23 | 10 | explicit.  You measure the offset, you identify the offset, and |
| 16:08:27 | 11 | based on that, you identify the source of the device -- this |
| 16:08:31 | 12 | source of transmission. |
| 16:08:32 | 13 | THE COURT:  Is that where the patent stops?  It is a |
| 16:08:34 | 14 | patent to solely determine the source -- |
| 16:08:39 | 15 | MR. KING:  Claim one. |
| 16:08:40 | 16 | THE COURT:  -- in the data packet. |
| 16:08:41 | 17 | MR. KING:  Claim one stops there.  Some of the |
| 16:08:44 | 18 | dependent claims go into other areas. |
| 16:08:47 | 19 | THE COURT:  Sure.  Sure.  So why can't it be "packet |
| 16:08:50 | 20 | one" and "packet two." |
| 16:08:51 | 21 | MR. DINOVO:  Because the -- well, first of all, |
| 16:08:54 | 22 | there's going to be invalidity issues.  But the reason the |
| 16:08:58 | 23 | patent -- that doesn't work in the patent is the |
| 16:09:00 | 24 | synchronization packet is intended to notify in a |
| 16:09:04 | 25 | unidirectional communication system that you need to start |

| | | |
|---|---|---|
| 16:09:08 | 1 | listening.  And not just start listening, you start listening |
| 16:09:11 | 2 | at a predetermined window for something that is now coming.  So |
| 16:09:15 | 3 | it is a wake-up packet.  And, again, we've talked about the |
| 16:09:20 | 4 | fact that the synchronization packet is not described in any |
| 16:09:25 | 5 | detail. |
| 16:09:26 | 6 | THE COURT:  So what's the difference if it's an |
| 16:09:28 | 7 | alarm clock or a clock radio?  What's the difference if it |
| 16:09:33 | 8 | wakes you up with a loud ringing or it wakes you up with music |
| 16:09:35 | 9 | or it wakes you up with your television coming on?  It's the |
| 16:09:38 | 10 | wake-up call.  What difference does it make what's in it? |
| 16:09:40 | 11 | MR. DINOVO:  Well, a timing beacon wasn't the same |
| 16:09:43 | 12 | according to them in the prosecution history.  They said that |
| 16:09:45 | 13 | wasn't a synchronization packet.  So I guess we can do it by |
| 16:09:48 | 14 | purposes of exclusion.  We know that they described the data |
| 16:09:52 | 15 | packet as containing data that is intended to be operated on by |
| 16:09:55 | 16 | the host processor.  So, presumably, it's not that.  It's not a |
| 16:09:59 | 17 | timing beacon.  So it is some sort of control packet that |
| 16:10:02 | 18 | contains synchronization information.  And we don't think a |
| 16:10:06 | 19 | fair reading of the patent is that they're identical.  So I |
| 16:10:08 | 20 | think we have at long last been able to crystallize what the |
| 16:10:12 | 21 | real dispute is here about synchronization of data packet. |
| 16:10:15 | 22 | THE COURT:  Yeah.  It's only taken me two hours and |
| 16:10:18 | 23 | 40 minutes to find out what your dispute is. |
| 16:10:21 | 24 | MR. KING:  I'd love to be able to address the -- |
| 16:10:21 | 25 | THE COURT:  It wasn't clear from your briefs.  I'll |

16:10:23  1  tell you that.  And I got a lot of prose in the briefs, and I

16:10:27  2  got a lot of attachments.

16:10:29  3           MR. DINOVO:  Well, I will join Mr. King in his

16:10:31  4  apology for our lack of clarity.

16:10:34  5           THE COURT:  If you're going to apologize, apologize

16:10:37  6  for all the patent lawyers.  You've done this no better or no

16:10:40  7  worse than anybody else has.  But you've got to narrow this

16:10:44  8  down to what we're talking about.  You know, when I ask a

16:10:49  9  question about what's in the patent, I want you to tell me what

16:10:52  10 you think, as accomplished patent lawyers who have dealt with a

16:10:58  11 lot of these, the patent is saying, not to just regurgitate up

16:11:03  12 to me here's where the language is.  That's where there is a

16:11:07  13 resistance among lawyers.  You know, tell me what the patent is

16:11:10  14 supposed to do, not what it says it's supposed to do.

16:11:13  15           Because, see, I am construing claims, which means I'm

16:11:17  16 just not taking -- neither of you are arguing really to me to

16:11:22  17 take specific language out of the patent for these

16:11:25  18 constructions.  You both have a perspective on it.  So what I

16:11:32  19 want to know is why this perspective is better than the way the

16:11:38  20 patent works.  And, you know, I sit here at one moment and I

16:11:44  21 think "signal" is really good, but I probably think it's too

16:11:47  22 broad.  And then I look at "a group of binary digits which is

16:11:51  23 switched, if at all, and transmitted to a composite whole."

16:11:55  24 I'm not sure that the jury is ever going to understand that.

16:12:04  25           And now, you know, we're down into the packets.  I've

16:12:07  1  questioned whether or not "first data packet" needs any

16:12:12  2  construction because it seems obvious to me that it is the

16:12:19  3  first packet of data that comes after the synchronization

16:12:22  4  packet.  Mr. DiNovo doesn't like that because "synchronization

16:12:25  5  packet" and "data packet" can be the same thing, you say.

16:12:30  6       So give me some help here, guys.  What really works

16:12:33  7  for the jury to understand what you're arguing about?

16:12:36  8       MR. DINOVO:  Actually, Your Honor, just for the

16:12:38  9  record, we absolutely don't think they can be the same thing.

16:12:41  10  My concern is I think you asked why there's a difference in our

16:12:44  11  approaches.

16:12:45  12       THE COURT:  I thought you told me you had concern

16:12:48  13  that it would be the same thing.

16:12:49  14       MR. DINOVO:  They will argue it's the same.  That's

16:12:51  15  correct, Your Honor.

16:12:52  16       THE COURT:  Well, if they're going to argue it's the

16:12:54  17  same, then their perception is that it's the same or could be

16:12:58  18  the same.

16:12:58  19       MR. KING:  I've said that.

16:13:00  20       THE COURT:  So I don't understand -- now I really

16:13:02  21  don't understand what your position is.  Mr. King is telling me

16:13:06  22  that they can take two packets that contain exactly the same

16:13:12  23  thing and they can sequence them.  The first one goes

16:13:16  24  through -- we're calling it in the patent a synchronization

16:13:18  25  packet -- and it turns on the clock.  Then another packet that

```
16:13:23  1    is exactly -- contains exactly the same data goes through after

16:13:29  2    the offset, and by that same set of data going through, it

16:13:34  3    tells the receiver what the source of the data was.  Is that

16:13:38  4    what you're saying?

16:13:39  5           MR. KING:  That's what I'm saying.  That's what the

16:13:42  6    specifications and claims say.

16:13:45  7           MR. DINOVO:  I agree that's what he's saying.

16:13:48  8           THE COURT:  So you don't need to be afraid of it

16:13:50  9    anymore because that's what it is.  So where is your

16:13:53  10   definition -- why do we need "first data packet" to be

16:13:57  11   construed?  Why is it not just obvious that it's the first

16:14:03  12   packet that comes through after the synchronization packet?

16:14:06  13          MR. DINOVO:  Because they are mistaken that the

16:14:10  14   synchronization -- that a synchronization packet can be a data

16:14:13  15   packet.  The patent specification talks about the

16:14:16  16   synchronization packet being specifically listened for by the

16:14:20  17   receiver and to wake up.  The data package is described

16:14:23  18   differently.  It has data that is ...

16:14:27  19          THE COURT:  No.  I understand what you're saying.

16:14:30  20          MR. DINOVO:  Okay.

16:14:30  21          THE COURT:  I'm just saying that I don't get it,

16:14:32  22   because I'm agreeing with Mr. King here that I don't think it

16:14:40  23   matters what's in the synchronization packet if all it's going

16:14:49  24   to do is turn on the clock.  You know, maybe it has pictures of

16:14:53  25   the President.  Maybe it has a football game in it.  But nobody
```

| | | |
|---|---|---|
| 16:14:56 | 1 | cares about it because it just turns on the clock. |
| 16:15:00 | 2 | MR. DINOVO:  And so how does the -- if that were |
| 16:15:02 | 3 | true, Your Honor, how would the system know which offset to |
| 16:15:06 | 4 | measure? |
| 16:15:08 | 5 | THE COURT:  Because it's -- well, that comes down to |
| 16:15:12 | 6 | what you aren't telling me.  My presumption was until I heard |
| 16:15:21 | 7 | argument earlier of regular and irregular and when things come |
| 16:15:27 | 8 | through, that as soon as the clock went on, the next thing that |
| 16:15:31 | 9 | came through created the duration of the offset.  That once it |
| 16:15:39 | 10 | started listening, the next thing that came through was what |
| 16:15:43 | 11 | stopped the clock, here's the offset, it goes to what Dr. Akl |
| 16:15:56 | 12 | called the -- what was it?  Whatever he called the list, the |
| 16:15:58 | 13 | table -- the lookup table.  That once it got the second |
| 16:16:02 | 14 | indication and stopped the clock and measured the offset, it |
| 16:16:06 | 15 | went to the lookup table to see what that offset was and that |
| 16:16:12 | 16 | told it where it got the data.  That's what I hear them saying. |
| 16:16:15 | 17 | MR. DINOVO:  The issue is, in order to measure an |
| 16:16:17 | 18 | offset, you have to measure, of course, between two timing |
| 16:16:20 | 19 | events.  And the claim two, for example, talks about receipt -- |
| 16:16:24 | 20 | listening for this on a periodic basis.  So it's not going to |
| 16:16:28 | 21 | hear it every time.  So the idea is that once it does hear a |
| 16:16:32 | 22 | synchronization packet, it's going to listen for the next data |
| 16:16:34 | 23 | packet and subtract them. |
| 16:16:35 | 24 | So we think the context of the patent is clear that |
| 16:16:38 | 25 | synchronization packet is a special type of packet that wakes |

16:16:41  1  the system up and lets it know to start measuring an offset.

16:16:45  2        THE COURT:  Now, he says it's not.  Now, all I'm

16:16:48  3  doing is construing terms right now.  I'm not deciding whether

16:16:51  4  it's indefinite, and I'm not deciding who wins.  It sounds to

16:16:55  5  me like your argument is more a merits argument than it is a

16:16:59  6  claims construction argument.  If CSR says that it doesn't

16:17:07  7  matter what's in the packet, then it doesn't matter what's in

16:17:13  8  the packet.  That may be helpful or harmful to you.  That may

16:17:18  9  mean you win your case because your argument is correct.  But

16:17:21  10  that's not a claims construction argument, because nobody --

16:17:25  11  nobody has told me that there is specialized data in the

16:17:29  12  synchronization packet.  You suspect it.  You state that it has

16:17:34  13  to be.  But I'm telling you that may be an indefiniteness

16:17:40  14  argument or a merits argument, but I don't think it's a claims

16:17:42  15  construction argument.

16:17:44  16        MR. DINOVO:  All right.

16:17:45  17        THE COURT:  And all I'm doing today is construing the

16:17:47  18  claims, and all my questions are going to construing claims and

16:17:52  19  coming up with what my construction is going to be.  And so

16:17:57  20  whether it really helps you or it really hurts CSR doesn't

16:18:02  21  matter.  If it is, there is a packet that hits the receiver and

16:18:11  22  turns on the clock and a packet that hits the receiver and

16:18:14  23  turns off the clock and the receiver -- its equipment measures

16:18:19  24  that offset, it goes to the lookup chart and says this is

16:18:24  25  coming from a cellular phone, that's what it's doing.

16:18:29  1                MR. DINOVO:  The final issue I'll raise with that

16:18:32  2     approach, Your Honor, is that the system is not just

16:18:34  3     measuring.  It's what claim one does, is identifying the device

16:18:38  4     based on the offset.  The other thing it does and the

16:18:42  5     specification is clear about is that it -- it is intended to --

16:18:45  6     to notify the receiver that data is coming.

16:18:49  7                And so this notion that, well, I can send data to

16:18:55  8     wake up the system, that system, then, would not -- when it

16:18:58  9     started listening for the data in a predetermined window, it

16:19:01  10    would not have received the first data packet and that

16:19:03  11    communication would have failed.  So the synchronization packet

16:19:07  12    is designed in this unilateral communication, according to the

16:19:09  13    patent specification, to let it know now you start listening

16:19:12  14    for data to be operated by the processor.

16:19:15  15               So in our view, a person of ordinary skill in the art

16:19:20  16    would understand this to be different types of packets and not

16:19:21  17    the same data.  But I understand the Court's expressed its

16:19:24  18    view, and we'll move on.

16:19:25  19               THE COURT:  No.  But I just -- you-all are just

16:19:28  20    talking this way to me.  You're saying a person ordinarily

16:19:32  21    skilled -- of ordinary skill in the art would think it's that

16:19:37  22    type of data, and you're saying that's not what they're

16:19:40  23    saying.  How do I possibly reconcile that?

16:19:43  24               MR. DINOVO:  I don't think Mr. King is in any better

16:19:46  25    position than us, because they acquired the patent from another

16:19:49  1   company.

16:19:49  2         THE COURT:  Sure.  But it's up to you to explain it

16:19:53  3   to me and to the jury and to make it clear.  It's not up to me

16:19:57  4   to figure it out.

16:19:58  5         MR. DINOVO:  Agreed, Your Honor.  And I'm not envious

16:20:00  6   of being in a position where there's such lack of specificity

16:20:04  7   in the specification about it.  I'm just using what little

16:20:07  8   there is in the short specification to discern that we think

16:20:10  9   that they're different types of packets.  They use different

16:20:13  10  names.  They didn't call it packet one and packet two.  They

16:20:17  11  called it a synchronization packet and a data packet.  And they

16:20:21  12  described functions that are associated with them.  One is the

16:20:21  13  synchronization packet is used for sync and the data packet

16:20:24  14  contains data that is used for the processor.  So we think they

16:20:28  15  are different.

16:20:29  16        THE COURT:  Okay.

16:20:30  17        MR. DINOVO:  Just very briefly, on the host

16:20:32  18  processing environment, we think that CSR's construction is

16:20:37  19  flawed because they read out the term "host."  And so we have

16:20:40  20  documents from their production where they use the term "host"

16:20:44  21  to refer to a computer that has peripherals, which I'm happy to

16:20:49  22  hand up to the Court if it will be of utility.  And this

16:20:52  23  document also, by the way, refers to packets that are of

16:20:55  24  digital nature.  So if I can approach?

16:20:57  25        MR. KING:  Your Honor, can I ask a question?  Those

| | | |
|---|---|---|
| 16:21:00 | 1 | are -- what documents are these? |
| 16:21:02 | 2 | MR. DINOVO:  These are documents that you produced. |
| 16:21:04 | 3 | MR. KING:  These are CSR documents.  We -- this is -- |
| 16:21:06 | 4 | we don't practice this patent, so I'm not sure how this is |
| 16:21:10 | 5 | relevant to the patent. |
| 16:21:11 | 6 | MR. DINOVO:  We think this document is relevant |
| 16:21:13 | 7 | because it shows how this term is used in the industry, |
| 16:21:16 | 8 | including by CSR. |
| 16:21:17 | 9 | MR. KING:  And what's the date of this document? |
| 16:21:20 | 10 | MR. DINOVO:  This is document is -- |
| 16:21:20 | 11 | MR. KING:  2011? |
| 16:21:21 | 12 | MR. DINOVO:  Yes. |
| 16:21:22 | 13 | MR. KING:  So that's how many years after the patent |
| 16:21:24 | 14 | was filed? |
| 16:21:25 | 15 | MR. DINOVO:  Are you contending that the meaning of |
| 16:21:25 | 16 | the term "packet" or "host" has differed? |
| 16:21:26 | 17 | MR. KING:  The Court can consider it to whatever |
| 16:21:29 | 18 | extent it wants to, but this is ten years after the patent was |
| 16:21:32 | 19 | filed and it relates to a company that doesn't practice the |
| 16:21:35 | 20 | patent that used the term "host."  I'm not sure what it's |
| 16:21:39 | 21 | proving. |
| 16:21:40 | 22 | THE COURT:  Pretty extrinsic, Mr. DiNovo, but pass it |
| 16:21:44 | 23 | up here. |
| 16:21:45 | 24 | MR. DINOVO:  All right. |
| 16:21:46 | 25 | THE COURT:  I have yet to see the case where I had to |

16:21:49   1   rely on extrinsic evidence.  This may be it.  But I don't think

16:21:54   2   I've ever rendered a Markman order where I got any particular

16:21:58   3   help from extrinsic evidence.

16:22:01   4            MR. DINOVO:  And the *Phillips* case certainly does

16:22:05   5   express a preference for intrinsic, Your Honor.

16:22:07   6            THE COURT:  Oh, I was that way before *Phillips*.

16:22:09   7            MR. DINOVO:  Is that right?  But so this document,

16:22:12   8   the reason we brought it up and it is extrinsic evidence, but

16:22:15   9   it's nice because on the front page it has two terms that are

16:22:20  10   in dispute.  One is "host" and the other is "packet."  And the

16:22:23  11   host here is described as the controlling party.  This relates

16:22:27  12   to a -- a communications protocol that CSR uses called GAIA.

16:22:35  13   And we did not include it because this is a restricted outside

16:22:38  14   attorney's only document.  But without getting into the

16:22:44  15   contents --

16:22:45  16            MR. KING:  Can I just put one more thing on the

16:22:47  17   record?  I'm sorry to interrupt.

16:22:48  18            MR. DINOVO:  Of course.

16:22:48  19            MR. KING:  This is also produced not in this case.

16:22:50  20            MR. DINOVO:  And we have an agreement that all

16:22:52  21   evidence can be used in all cases.

16:22:54  22            MR. KING:  I understand.  I'm not disputing that.

16:22:57  23   I'm just saying I've never seen this document because this is a

16:22:59  24   document that has not been part of this case.

16:23:01  25            MR. DINOVO:  Okay.  And, again, briefly, Your Honor,

16:23:04 I'm not going to read the document because it has been
16:23:06 designated as attorney's eyes only. But it does refer to the
16:23:11 host as having peripherals in the wire protocol in section two,
16:23:13 and then it describes a packet format. And we would just point
16:23:15 out to the Court that this is consistent entirely with our
16:23:18 proposal of "packet" -- the packet is digital. It has specific
16:23:23 bit lengths. It's a collection. It's used for communication
16:23:26 as a unit. And so you'll see that the specific CSR packet
16:23:31 structure disclosed there on section 2.1.
16:23:33 That's all I had, Your Honor, unless you have a
16:23:39 question.
16:23:39 THE COURT: Tell me what your -- how you distinguish
16:23:41 a computer from a processor.
16:23:43 MR. DINOVO: I think a computer has more -- typically
16:23:46 has an input device. The reason that I think that "computer"
16:23:50 is a better term than a "processor," although, honestly, I
16:23:53 don't think the case is going to turn on this distinction, is
16:23:57 that a computer is going to have input/output, for example.
16:24:00 There is a technical definition of computer in that it has to
16:24:03 have an input/output. And so a processor theoretically might
16:24:08 not.
16:24:08 But the idea of a host here is that -- as depicted in
16:24:12 the drawing, is that it's going to have the ability to
16:24:14 communicate with peripherals. And the examples of course
16:24:18 consistently with our argument today in the -- of the

```
16:24:22  1  peripherals are both Bluetooth devices.  One is a Bluetooth
16:24:27  2  keyboard, and one is a Bluetooth mouse.  And so those
16:24:31  3  peripherals are attached to the host computer.
16:24:32  4         They use the term "processor."  We can't argue with
16:24:33  5  it because it's in the term itself, but it's circular.  So what
16:24:36  6  we're saying is the host processing environment is a little bit
16:24:40  7  bigger than the processor, and it includes the computer.  And
16:24:43  8  the computer is not just a computer in isolation.  As of -- as
16:24:47  9  a host, it has to have the capability to have peripherals.  And
16:24:53 10  I think that's consistent with CSR's usage and consistent with
16:24:56 11  the definitions we've presented in our briefing.
16:25:01 12         THE COURT:  All right.  Thank you.  I encourage you
16:25:04 13  now that you have heard what I've had to say -- which I suspect
16:25:08 14  has not been really exciting to either one of you, but I'm the
16:25:15 15  one that's got to wrestle with this and I'm the one at the end
16:25:19 16  of day that's got to figure it out -- to sit down based on my
16:25:23 17  comments and talk about -- we're not dealing with a lot of
16:25:27 18  definitions -- I mean, a lot of terms here -- and see if you
16:25:34 19  can work out some of your differences in these things.  I don't
16:25:39 20  think that you're that far apart on language in a lot of these
16:25:48 21  things.  And I think if you sit down and put your minds to it,
16:25:51 22  you ought to be able to reconcile this.
16:25:55 23         I say, again, that my goal is to get this case ready
16:26:00 24  to try.  Patent cases are inherently difficult in that regard
16:26:07 25  because both -- you don't need -- you can sit down.  You don't
```

```
16:26:13   1   need to stand up -- both the Congress and the courts keep
16:26:17   2   adding other levels.  We've got to have a Markman hearing.
16:26:22   3   We've got to have a dispositive motion phase.  We've got to
16:26:28   4   have a trial.  There was a time when there was a big argument
16:26:32   5   about whether we ought to artificially insert another phrase --
16:26:37   6   another phase on willfulness.  And the whole system appears to
16:26:43   7   me to be designed not to reach resolution, but to just keep us
16:26:51   8   going around in this loop.
16:26:55   9               My goal is to try to get this case to resolution, and
16:26:59   10  I think it would be helpful if you-all would take a look at
16:27:08   11  this.  I can assure you I'm not going to give you an order that
16:27:11   12  gives you so many days.  We're going to start working on this.
16:27:15   13  Clearly, it's going to take a while to get out a claims
16:27:18   14  construction order, but we're going to start on it right away.
16:27:25   15              It would be helpful if you could sit down with one
16:27:29   16  another and discuss some of the things that we have discussed
16:27:32   17  here today and see if you can clear up some of this.  It would
16:27:36   18  be helpful to both of you, because otherwise what you get is
16:27:40   19  what I think and you don't get an interlocutory appeal on it.
16:27:47   20  So it lays -- it lies in the weeds until the case gets through
16:27:53   21  on the merits and goes up.
16:27:57   22              So I think it would behoove you to see if you can
16:28:01   23  work some of these things out.  If you can't, that's fine.  But
16:28:04   24  what you may get are claims constructions that nobody really
16:28:08   25  likes, because when I sit down and compare my notes to your
```

16:28:12  1  briefing and to the patent, I may come up with something

16:28:17  2  totally different from what we have discussed here today.  So

16:28:21  3  it's worth thinking about, and it's worth something your

16:28:24  4  clients need to think about.

16:28:26  5        But I realize at least parts of you have trips to

16:28:35  6  Australia in the future, so you might not be able to get around

16:28:38  7  to this, at least based on what I heard on the telephone about

16:28:41  8  where the next round of discovery in the overall picture may

16:28:45  9  take place.

16:28:46  10        But thank you for your presentations today.  Claims

16:28:48  11  construction is under advisement, and the Court will get

16:28:51  12  something out as quickly as possible.  Court's in recess.

16:28:55  13        (End of transcript)

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1   **UNITED STATES DISTRICT COURT      )**

2   **WESTERN DISTRICT OF TEXAS         )**

3        I, Arlinda Rodriguez, Official Court Reporter, United

4   States District Court, Western District of Texas, do certify

5   that the foregoing is a correct transcript from the record of

6   proceedings in the above-entitled matter.

7        I certify that the transcript fees and format comply with

8   those prescribed by the Court and Judicial Conference of the

9   United States

10       WITNESS MY OFFICIAL HAND this the 23rd day of August 2012.

11

12                              /S/ Arlinda Rodriguez
                                Arlinda Rodriguez, Texas CSR 7753
13                              Expiration Date:  12/31/2012
                                Official Court Reporter
14                              United States District Court
                                Austin Division
15                              200 West 8th Street, 2nd Floor
                                Austin, Texas 78701
16                              (512) 916-5143

17

18

19

20

21

22

23

24

25